FILED

**Margareta Collin**
2350 Vista Ridge ln
Signal Hill CA 90755
310 951-5923

2012 JUL -6 PM 2: 53

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE CALIFORNIA *CENTRAL* DISTRICT

BY

| | |
|---|---|
| MARGARETA COLLIN | Case No. |
| Plaintiff, | **COMPLAINT** |
| V. | **CV12 05858 R** (Ex) |
| FIRST AMERICAN TRUSTEE SERVICING SOLUTION, LLC, WELLS FARGO BANK, N.A., US BANK NATIONAL ASSOCIATION TRUSTEE SERVICING AS TRUSTEE FOR CMLTI 2007-AR8, And Does 1-10 | **TRIAL BY JURY DEMANDED HEREIN** |
| Defendant(s). | |

**PLAINTIFF MARGARETA COLLIN COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

Plaintiff, Margareta Collin, by its undersigned alleges as follows:

This is an action under Sections 5(a) and 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a) and 53(b), to secure permanent injunctive relief and other equitable relief, including rescission, reformation, restitution, and disgorgement, against defendants for engaging in unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, as amended, 15 U.S.C. § 45(a), and acts or practices in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, as amended, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, as amended, and the Truth in Lending Act's ("TILA") implementing Regulation Z, 12 C.F.R. § 226, as amended.

**JURISDICTION AND VENUE**

This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. §§ 45(a), 53(b), 1607(c), 1681s(a), 1692l(a), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

1

1  Venue is proper in the United States District Court for the Southern District of California under 28
2  U.S.C. §§ 1391(b) and (c), and 15 U.S.C. § 53(b).

3  **PLAINTIFF**

4  Plaintiff, Margareta Collin (hereinafter Collin is an citizen living in California and at all times
5  relevant to the facts in this complaint was living in the City of Signal Hill, California, County of
   Los Angeles, at 2350 Vista Ridge Lane, Signal Hill, California (hereinafter home).

6
7  **THE DEFENDANTS**

8  Defendant First American Trustee Servicing Solutions LLC, is a limited liability company that
   maintains its principal place of business in Westlake, Texas and transacts business in this District.

9
10 Defendant Wells Fargo Bank N.A, is a corporation that maintains its principal place of business in
   Des Monies, IA,  and transacts business in this District.

11
12 Defendant U.S Bank National Association Trustee Servicing as Trustee for CMLTI 2007-AR8,
   Asset Backed Certificates and is a debt collector as defined by 15 USC 1692 et seq, with a
   principal place of business at 4801 Frederica Street Owensboro, KY 42301.

13
14 Defendant First American Trustee Servicing Solution, LLC directs, controls, formulates, or
   participates in the acts or practices alleged in this complaint.

15
16 Defendants are "debt collectors" as defined in Section 803(6) of the FDCPA, 15
   U.S.C. § 1692a(6).

17
18 In connection with the servicing and collection of mortgage loans, defendants furnish information
   to consumer reporting agencies. As such, defendants are subject to Section 623oftheFCRA,
19 15U.S.C. §1681s-2, which imposes a series of duties and prohibitions upon any person or entity
   that furnishes information to a consumer reporting agency.
20 Defendants are "creditors," as that terms is defined in Section 103(t) of the TILA, 15 U.S.C. §
   1602(t), and Section 226.2(a)(l7) of Regulation Z, 12 C.F.R. § 226.2(a)(17), and therefore are
21 required to comply with applicable provisions of the TILA and Regulation Z.

22
23 **COMMERCE**

24 The acts and practices of defendants alleged in this complaint have been in or
   affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.
25
26 **DEFENDANTS' BUSINESS PRACTICES**

27 Defendants play a prominent role in the secondary market for residential mortgage loans by
   acquiring, servicing, and selling large volumes of such loans. In recent years, during the explosive
28 growth of the mortgage industry, defendants acquired and securitized loans at a rapid pace, paying

inadequate attention to the integrity of consumers' loan information and to sound servicing practices. As a result, in servicing consumers' loans, defendants neglected to obtain timely and accurate information on consumers' loans, made inaccurate claims to consumers, and engaged in unlawful collection and servicing practices.

Defendants operate a vertically integrated mortgage business, which includes the acquisition and servicing of residential mortgage loans, and the packaging of those loans into mortgage backed securities ("MBS") for sale to investors. FIRST AMERICAN TRUSTEE is the mortgage servicer for many of the loans acquired by defendants. WELLS FARGO, employees are primarily responsible for the acquisition of loans, such as the identification, bidding, and negotiation of deals, although frequently WELLS FARGO is listed as the purchaser and subsequent seller on MBS documents. In many instances, after the defendants have acquired loans and WELLS FARGO has begun servicing them, WELLS FARGO packages the loans into MBS. After the loans have been packaged into MBS and sold on the secondary market, WELLS FARGO often continues to service the loans pursuant to servicing agreements. In some instances, WELLS FARGO also retains a residual ownership interest in the loans.

Many of the loans acquired, serviced, and sold by the defendants are subprime or "Alt-A," *i.e.,* less than prime, or "A," credit. These loans include "nontraditional" mortgages such as pay option adjustable rate mortgages ("ARMs"), interest-only mortgages, negative amortization loans, and loans made with little or no income or asset documentation. In recent years, defendants funded and acquired an increasing number of loans, and WELLS FARGO loan servicing portfolio overall grew significantly. As of September 2007, WELLS FARGO serviced over 475,000 mortgage loans with a total unpaid principal balance of approximately $80 billion.

As a mortgage servicer, WELLS FARGO makes various representations to borrowers, including on loans newly acquired by defendants. Specifically, in collection calls and notices, monthly statements, payoff statements, foreclosure notices, bankruptcy filings, and otherwise, WELLS FARGO routinely makes representations to borrowers about their loans, including: (1) the unpaid principal balance; (2) the due date; (3) the interest rate; (4) the monthly payment amount; (5) the delinquency status; and (6) fees and corporate advances assessed by prior loan servicers. In many instances, WELLS FARGO makes these representations to borrowers within days of the transfer of the loans for servicing to WELLS FARGO. For example, WELLS FARGO begins making collection calls on those transferred loans that are purportedly past due. In many instances, however, WELLS FARGO makes these early collection calls and sends collection notices to consumers before it has obtained complete loan information from the seller and before it has conducted quality control and other data integrity checks to ensure the accuracy of the representations it makes to borrowers.

In numerous instances, WELLS FARGO has lacked a reasonable basis for its representations to borrowers, because it failed to obtain accurate and complete information about the consumer's loan account before making the representation. Despite indications that loan data obtained from prior loan servicers and loaded onto its servicing system was likely inaccurate or unverified, WELLS FARGO nonetheless used that data to make representations to borrowers about their loans. As a result, defendants have made inaccurate claims to consumers and engaged in unwarranted collection practices.

As a mortgage servicer, WELLS FARGO receives consumers' disputes regarding the status and handling of their loans. In numerous instances, WELLS FARGO has failed to investigate and resolve consumers' disputes in a timely manner. In addition, in numerous instances, WELLS

FARGO has failed to report consumers' loan accounts as disputed when furnishing information to consumer reporting agencies.

In connection with loans that were in default when obtained by defendants, WELLS FARGO has failed to disclose in initial communications with consumers that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose. In addition, WELLS FARGO has failed to send consumers a written notice, or has sent untimely or defective notices, containing the amount of the debt, the creditor's name, and the consumer's rights to dispute the debt and obtain verification of the debt.

In numerous instances, including in connection with newly-acquired loans, WELLS FARGO has made collection calls to borrowers repeatedly and with excessive frequency under the circumstances. In addition, in numerous instances, WELLS FARGO has made collection calls using cell phones that display only the borrower's local area code on the borrower's caller identification display ("caller ID"), and without identifying its name on the caller ID. WELLS FARGO has used cell phones and caller ID in this fashion notwithstanding that WELLS FARGO was not calling from the borrower's local area code.

As a mortgage servicer, WELLS FARGO "advances" money to a borrower to pay for items, such as property inspections, that it deems necessary to protect the note holder's rights in the property. Pursuant to the mortgage contract, WELLS FARGO adds these "corporate advances" to the consumer's loan balance. In many instances, however, WELLS FARGO has charged borrowers for property inspections that were not authorized by the mortgage contract. For example, WELLS FARGO has charged borrowers for alleged property inspection fees, where the purpose of the inspector's visit to the consumer's home was to attempt to collect on the loan. In addition, WELLS FARGO has charged borrowers for property inspections on newly acquired loans notwithstanding that WELLS FARGO lacked a reasonable basis for the need for a property inspection.

As a mortgage servicer, WELLS FARGO also charges borrowers other fees, such as late fees in connection with alleged defaults and prepayment penalties in connection with loan payoffs. In numerous instances, defendants have charged borrowers for fees, including late fees and prepayment penalties, in violation of state law.

In addition, in numerous instances, WELLS FARGO has charged borrowers a loan modification fee -typically, $500 -and automatically included this fee in the principal balance of the modified loan on which interest accrued. In doing so, WELLS FARGO has caused the borrower's loan balance to increase and created a new transaction, but has failed to provide the borrower with new loan disclosures as required by the TILA's Regulation Z. In addition, WELLS FARGO has misrepresented that its modification fee is a corporate advance authorized by the mortgage contract, and has charged borrowers for the fee without authorization.

When borrowers request the amount of money necessary to reinstate or payoff their loan, and in other instances where WELLS FARGO seeks payment, WELLS FARGO's demands often contain fees that have been assessed by WELLS FARGO, including fees for property inspections, late fees, prepayment penalties, and loan modifications. In many instances, these demands include unauthorized fees.

## FEDERAL TRADE COMMISSION ACT VIOLATIONS

### Count I: Misrepresentation of Amounts Owed

Plaintiff incorporates by reference all the foregoing paragraphs.

4

In the course and conduct of their loan servicing and collection, defendants in numerous instances have represented, expressly or by implication, that consumers owe the amounts specified in defendants' communications.

In truth and in fact, in numerous instances, consumers do not owe the amounts that have been specified in defendants' communications. Consumers do not owe the amounts specified because, for example, (a) fees included in the amounts specified are not allowed under the mortgage contract or permitted by law; and/or (b) the amounts specified have been assessed or calculated incorrectly.

Therefore, defendants' representations as set forth are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II: Unfair and Deceptive Assessment and Collection of Fees**

Plaintiff incorporates by reference all the foregoing paragraphs.

In the course and conduct of their loan servicing and collection, defendants in numerous instances have represented, expressly or by implication, that fees assessed and collected by WELLS FARGO were (a) allowed under the mortgage contract and (b) permitted by law.

On numerous occasions, the fees assessed and collected by WELLS FARGO were (a) not allowed under the mortgage contract or (b) not permitted by law. Nonetheless, WELLS FARGO improperly assessed and collected these fees.

Defendants' actions have caused and are likely to cause substantial injury to consumers. This injury is not reasonably avoidable by consumers and not outweighed by countervailing benefits to consumers or competition.

Defendants' acts or practices constitute unfair and deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

**Count III: Deceptive Reasonable Basis Claims**

Plaintiff incorporates by reference all the foregoing paragraphs.

In the course and conduct of their loan servicing and collection, defendants in numerous instances have represented, expressly or by implication, that they possessed and relied on a reasonable basis substantiating their representations about consumers' loans.

In truth and in fact, in numerous instances, defendants have not possessed and relied on a reasonable basis substantiating their representations about consumers' loans.

Therefore, defendants' representations as set forth are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT**

In 1977, Congress passed the FDCPA, 15 U.S.C. § 1692 *et seq.*, which became effective in 1978, and has been in force since that date. Section 814 of the FDCPA, 15 U.S.C. § 1692l, specifically empowers the Commission to enforce the FDCPA. Under its provisions, for purposes of the exercise by the Commission of its functions and powers under the FTC Act, a violation of the FDCPA is deemed an unfair or deceptive practice in violation of the FTC Act. Further, the Commission is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the FDCPA by any person, irrespective of whether that person is engaged in

commerce or meets any other jurisdictional tests set by the FTC Act. The authority of the Commission in this regard includes the power to enforce the provisions of the FDCPA in the same manner as if the violations of the FDCPA were violations of a Federal Trade Commission trade regulation rule.

**Count IV: Harassment or Abuse**

Plaintiff incorporates by reference all the foregoing paragraphs.

On numerous occasions, in connection with the collection of debts that were in default when obtained by defendants, defendants have used conduct the natural consequence of which is to harass, oppress, or abuse any person, in violation of Section 806 of the FDCPA, 15 U.S.C. § 1692d, including but not limited to:

(a) causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number, in violation of Section 806(5) of the FDCPA, 15 U.S.C. § 1692d(5); and

(b) the placement of telephone calls without meaningful disclosure of the caller's identity, in violation of Section 806(6) of the FDCPA, 15 U.S.C. § 1692d(6).

Pursuant to Section 814 of the FDCPA, 15 U.S.C. § 1692l the acts and practices alleged in also constitute unfair or deceptive acts or practices in violation of the FTC Act.

**Count V: False or Misleading Representations**

Plaintiff incorporates by reference all the foregoing paragraphs.

On numerous occasions, in connection with the collection of debts that were in default when obtained by defendants, defendants have used false, deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA, 15 U.S.C. § 1692e, including but not limited to:

(a) Falsely representing the character, amount, or legal status of a debt, or any services rendered or compensation which may be lawfully received by a debt collector for collection of a debt, in violation of Sections 807(2)(A) and (B) of the FDCPA, 15 U.S.C. §§ 1692e(2)(A) and (B);

(b) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed, in violation of Section 807(8) of the FDCPA, 15 U.S.C. § 1692e(8);

(c) Using false representations or deceptive means to collect or attempt to collect a debt or to obtain information concerning a consumer, in violation of Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10); and

(d) Failing to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, in violation of Section 807(11) of the FDCPA, 15 U.S.C. § 1692e(11).

Pursuant to Section 814 of the FDCPA, 15 U.S.C. § 1692l, the acts and practices alleged also constitute unfair or deceptive acts or practices in violation of the FTC Act.

6

**Count VI: Unfair Practices**

Plaintiff incorporates by reference all the foregoing paragraphs.

On numerous occasions, in connection with the collection of debts that were in default when obtained by defendants, defendants have used unfair or unconscionable means to collect or attempt to collect a debt, including but not limited to collecting amounts (including any interest, fee, charge, or expense incidental to the principal obligation) not authorized by the agreement creating the debt or permitted by law, in violation of Section 808(1) of the FDCPA, 15 U.S.C. § 1692f(1).

Pursuant to Section 814 of the FDCPA, 15 U.S.C. § *1692l,* the acts and practices alleged also constitute unfair or deceptive acts or practices in violation of the FTC Act.

**Count VII: Validation of Debts**

Plaintiff incorporates by reference all the foregoing paragraphs.

On numerous occasions, in connection with the collection of debts that were in default when obtained by defendants, defendants have failed to notify consumers of their right to dispute and obtain verification of their debts and to obtain the name of the original creditor, either in the initial communication with consumers by defendants, or within five days thereafter, in violation of Section 809(a) of the FDCPA, 15 U.S.C. § 1692g(a).

Pursuant to Section 814 of the FDCPA, 15 U.S.C. § 1692l, the acts and practices alleged also constitute unfair or deceptive acts or practices in violation of the FTC Act.

**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**

In 1970, Congress passed the FCRA, 15 U.S.C. § 1681 *et seq.,* which became effective in 1971, and has been in force since that date. Section 621(a) of the FCRA, 15 U.S.C. § 1681s(a), specifically empowers the Commission to enforce the FCRA. Under its provisions, for purposes of the exercise by the Commission of its functions and powers under the FTC Act, a violation of the FCRA is deemed an unfair or deceptive practice in violation of the FTC Act. Further, the Commission is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the FCRA by any person, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests set by the FTC Act.

**Count VIII: Failure to Report Disputes**

Plaintiff incorporates by reference all the foregoing paragraphs.

In numerous instances in which consumers have informed defendants that they dispute the completeness or accuracy of information furnished by defendants to a consumer reporting agency, defendants have not reported the disputes to any or all of the consumer reporting agencies to which they furnish or have furnished the information.

The acts and practices alleged in paragraph 52 constitute violations of Section 623(a)(3) of the FCRA, 15 U.S.C. § 1681s-2(a)(3).

Pursuant to Section 621(a) of the FCRA, 15 U.S.C. § 1681s(a)(I), the acts and practices alleged also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

7

## VIOLATIONS OF THE TILA'S REGULATION Z

In 1968, Congress passed the TILA, 15 U.S.C. § 1601 *et seq.*, which became effective in 1969, and has been in force since that date. Section 108(c) of the TILA, 15 U.S.C. § 1607(c), specifically empowers the Commission to enforce the TILA. Under its provisions, for purposes of the exercise by the Commission of its functions and powers under the FTC Act, a violation of any requirement imposed under the TILA shall be deemed a violation of a requirement imposed under the FTC Act. Further, the Commission is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the TILA by any person, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests set by the FTC Act.

### Count IX: Failure to Provide Required Disclosures

Plaintiff incorporates by reference all the foregoing paragraphs.
On numerous occasions, in the course and conduct of loan servicing and collection, defendants have included the cost of a modification fee (typically, $500) in the unpaid principal balance of modified loans, without providing required disclosures, in violation of Sections 226.18 and 226.20 of Regulation Z, 12 C.F.R. §§ 226.18 and 226.20. Regulation Z, 12 C.F.R. § 226, is issued by the Board of Governors of the Federal Reserve System and is the implementing regulation for the TILA.
Pursuant to Section 108(c) of the TILA, 15 U.S.C. § 1607(c), every violation of the TILA and Regulation Z constitutes a violation of the FTC Act.

## CONSUMER INJURY

Consumers have suffered, and will continue to suffer, substantial injury as a result of defendants' violations of the FTC Act, FDCPA, FCRA, and the TILA's Regulation Z. Absent injunctive relief by this Court, the defendants are likely to continue to injure consumers and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief, including consumer redress, disgorgement and restitution, to prevent and remedy any violations of any provision of law enforced by the Commission.
This Court, in the exercise of its equitable jurisdiction, may award other ancillary relief to remedy injury caused by defendants' law violations.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff request that this Court, pursuant to section 13(b) of the FTC Act, 15 U.S.C. § 53(b), section 814(a) of the FDCPA, 15 U.S.C. §1692*l*(a), section 621(a) of the FCRA, 15 U.S.C. § 1681s(a), section 108(c) of the TILA, 15 U.S.C. §1607(c), and pursuant to its own equitable powers:

8

1. Enter a permanent injunction to prevent future violations of the FTC Act, the FDCPA, the FCRA, and the TILA's Regulation Z;
2. Award such relief as the Court finds necessary to redress injury to consumers resulting from defendants violations of the FTC Act, FDCPA, FCRA, and the TILA's Regulation Z, including but not limited to rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement of ill-gotten gains; and
3. Award plaintiff the cost of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: 7/6-12

Respectfully submitted,

Margaret Collin
2350 Vista Ridge Lane
Signal Hill, California 90755

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# "EXHIBIT 1"



Certified Forensic Loan Auditors

# H.E.L.M INC...

18565 SOLEDAD CANYON RD. # 209
CANYON COUNTRY, CA. 91351
Phone: 424-218-9069;
FORENSICAUDITSWIN@GMAIL.COM

# *PROPERTY*
# *SECURITIZATION ANALYSIS REPORT[TM]*

"This is a Securitization Analysis Report and not a Forensic Audit Report"

*Prepared for:*
## MARGARETA COLLIN

*For Property Address*

*2350 VISTA RIDGE LANE*
*SIGNAL HILL CA 90755*

*Prepared on:*
*MAY 15, 2012*



Certified Forensic Loan Auditors

# SECTION 1:   TRANSACTION DETAILS

## BORROWER & CO-BORROWER:

| BORROWER | CO-BORROWER |
|---|---|
| MARGARETA COLLIN | NONE |
| CURRENT ADDRESS | SUBJECT ADDRESS |
| SAME | *2350 VISTA RIDGE LANE*<br>*SIGNAL HILL CA 90755* |

## TRANSACTION PARTICIPANTS

| MORTGAGE BROKER | MORTGAGE SERVICER | MORTGAGE NOMINEE/BENEFICIARY |
|---|---|---|
| WELLS FARGO HOME MORTGAGE 3601 MINNISOTA DR. SUITE 200 BLOOMINGTON, MN 55435 | WELLS FARGO BANK N.A. | NONE NO NOMONIEE TO RECORD OR TRANSFER ASSIGNMENT |
| ORIGINAL MORTGAGE LENDER | MORTGAGE TRUSTEE | TITLE COMPANY |
| Treasury FEDERAL RESERVE | FIDELITY NATIONAL TITLE INSURANCE COMPANY | UNITED TITLE COMPANY 4165 E THOUSAND OAKS BLVD #290 WESTLAKE VILLAGE, CA 91362 |



Certified Forensic Loan Auditors

# SECTION 2: SECURITIZATION
## SECURITIZATION PARTICIPANTS:

| ORIGINATOR/LENDER | SPONSOR/SELLER | DEPOSITOR |
|---|---|---|
| **WELLS FARGO HOME MORTGAGE** 3601 MINNISOTA DR. SUITE 200 BLOOMINGTON, MN 55435 | **Citigroup Global Markets Realty Corp.** Sponsor | **Citigroup Mortgage Loan Trust Inc.** Depositor |
| **ISSUING ENTITY** | **TRUSTEE** | **MASTER SERVICER/ SERVICER** |
| **Citigroup Mortgage Loan Trust 2007-AR8** *Issuing Entity* | **U.S. Bank National Association, a national banking association** *Trustee* | **Wells Fargo Bank, N.A.** |
| **CUSTODIAN** | **CUT - OFF DATE** | **CLOSING DATE** |
| **SECTION 8.12(xi)** Securities Administrator appointed JPMorgan Trust to act as custodian | **CUT OFF DATE** July 1, 2007. | **On or about JULY 31, 2007.** |



**Certified Forensic Loan Auditors**

# PROSPECTUS INFORMATION

*Prospectus Supplement dated July 30, 2007 (To Prospectus dated July 30, 2007)*

*$867,819,200 (Approximate; subject to a permitted variance of plus or minus 5%)*
*Citigroup Mortgage Loan Trust 2007-AR8*
*Issuing Entity*

*Mortgage Pass-Through Certificates, Series 2007-AR8*

*Citigroup Mortgage Loan Trust Inc.*
*Depositor*

*Citigroup Global Markets Realty Corp.*
*Sponsor*

*Countrywide Home Loans Servicing LP*
*Wells Fargo Bank, N.A.*
*GreenPoint Mortgage Funding, Inc.*
*Servicers*
*CitiMortgage, Inc.*
*Master Servicer and Trust Administrator*

*Citibank, N.A.*
*Paying Agent, Certificate Registrar and Authenticating Agent*

*Pooling and Servicing Agreement*



Certified Forensic Loan Auditors

# DESCRIPTION OF THE MORTGAGE POOL

CITIGROUP MORTGAGE LOAN TRUST INC.
Depositor

CITIMORTGAGE, INC.
Master Servicer and Trust Administrator

CITIBANK, N.A.
Paying Agent, Certificate Registrar and Authenticating Agent

and
U.S. BANK NATIONAL ASSOCIATION
Trustee

POOLING AND SERVICING AGREEMENT
Dated as of July 1, 2007

Mortgage Pass-Through Certificates
Series 2007-AR8

**http://www.secinfo.com/dqTm6.u27x.c.htm**

## SUMMARY OF PROSPECTUS SUPPLEMENT

The following summary is a very broad overview of the certificates offered by this prospectus supplement and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered certificates, carefully read this entire prospectus supplement and the entire accompanying prospectus.

| | |
|---|---|
| Title of Series | Citigroup Mortgage Loan Trust Inc., Mortgage Pass-Through Certificates, Series 2007-AR8. |
| Cut-off Date | July 1, 2007. |
| Closing Date | On or about July 31, 2007. |
| Issuing Entity | Citigroup Mortgage Loan Trust 2007-AR8. The issuing entity will be established under a pooling and servicing agreement, as described under "Pooling and Servicing Agreement" in this prospectus supplement. The issuing entity is also sometimes referred to herein as the "trust" or the "trust fund." *See "The Issuing Entity" in this prospectus supplement.* |
| Depositor | Citigroup Mortgage Loan Trust Inc., a Delaware corporation and an affiliate of Citigroup Global Markets Inc. The depositor will deposit the mortgage loans into the trust. *See "The Depositor" in this prospectus supplement.* |
| Originators | Countrywide Home Loans, Inc., GreenPoint Mortgage Funding, Inc. and Wells Fargo Bank, N.A. is each an originator of a portion of the mortgage loans. Countrywide Home Loans, Inc. originated more than 20% of the mortgage loans in Collateral Pool 1 and Wells Fargo Bank, N.A. originated more than 20% of the mortgage loans in Collateral Pool 2. *See "The Originators" in this prospectus supplement.* |
| Servicers | Countrywide Home Loans Servicing LP, a Texas limited partnership (referred to |



**Certified Forensic Loan Auditors**

in this prospectus supplement as Countrywide Servicing); GreenPoint Mortgage Funding, Inc., a New York corporation (referred to in this prospectus supplement as GreenPoint); and Wells Fargo Bank, N.A., a national banking association (referred to in this prospectus supplement as Wells Fargo Bank). Countrywide Servicing will service the mortgage loans that were originated by it or one of its affiliates. GreenPoint will service the mortgage loans that were originated by it or one of its affiliates. Wells Fargo Bank will service the mortgage loans that were originated by it or one of its affiliates. Any obligation specified to be performed by the master servicer in the prospectus will be, with respect to the servicing of the mortgage loans, an obligation to be performed by the related servicer pursuant to the related servicing agreement or by the master servicer pursuant to the pooling and servicing agreement, as described herein. See "The Servicers" in this prospectus supplement.

|  |  |
|---|---|
| Master Servicer | CitiMortgage, Inc. (referred to in this prospectus supplement as CitiMortgage or the master servicer), a New York corporation and an affiliate of Citigroup Global Markets Inc. Any obligation specified to be performed by the master servicer in the prospectus will be, with respect to the servicing of the mortgage loans, an obligation to be performed by each servicer pursuant to a servicing agreement or by the master servicer pursuant to the pooling and servicing agreement, as described herein. See "Pooling and Servicing Agreement—The Master Servicer and Trust Administrator" in this prospectus supplement. |
| Sponsor and Seller | Citigroup Global Markets Realty Corp., a New York corporation and an affiliate of Citigroup Global Markets Inc. The sponsor will sell the mortgage loans to the depositor. See "The Sponsor" in this prospectus supplement. |
| Trust Administrator | CitiMortgage, Inc. (referred to in this prospectus supplement as CitiMortgage or the trust administrator), a New York corporation and an affiliate of Citigroup Global Markets Inc. See "Pooling and Servicing Agreement—The Master Servicer and Trust Administrator" in this prospectus supplement. |
| Paying Agent, Certificate Registrar and Authenticating Agent | Citibank, N.A., (referred to in this prospectus supplement as Citibank or the paying agent, certificate registrar or authenticating agent as applicable), a national banking association and an affiliate of Citigroup Global Markets Inc. See "Pooling and Servicing Agreement—Citibank" in this prospectus supplement. |
| Trustee | U.S. Bank National Association, a national banking association. See "Pooling and Servicing Agreement—The Trustee" in this prospectus supplement. |
| Custodians | Citibank, N.A., a national banking association and an affiliate of Citigroup Global Markets Inc., with respect to the mortgage loans originated by Countrywide Home Loans, Inc. and GreenPoint, and Wells Fargo Bank, N.A., a national banking association, with respect to the mortgage loans originated by Wells Fargo Bank. See "Pooling and Servicing Agreement—The Custodians" in this prospectus supplement. |
| Distribution Dates | Distributions on the offered certificates will be made on the 25th day of each month, or, if that day is not a business day, on the next succeeding business day, beginning in August 2007. |
| Final Scheduled Distribution Date | The final scheduled distribution date for the Group 1 Certificates will be the distribution date in August 2037 and the final scheduled distribution date for the Group 2 Certificates will be the distribution date in July 2037. The actual final distribution date for each class of certificates may be earlier, and could be |



Certified Forensic Loan Auditors

substantially earlier, than the applicable final scheduled distribution date.

| Offered Certificates | Only the certificates listed in the immediately following table are being offered by this prospectus supplement. Each class of offered certificates will have the initial certificate principal balance if applicable and pass-through rate set forth or described in the immediately following table. |

| Class | Initial Certificate Principal Balance ($) [1] | Pass-Through Rate | Designations |
|---|---|---|---|
| 1-A1A | 270,968,000 | Variable(2) | Group 1-1 Super Senior |
| 1-A1B | 15,557,000 | Variable(2) | Group 1-1 Senior Support |
| 1-A2A | 35,216,000 | Variable(2) | Group 1-2 Super Senior |
| 1-A2B | 2,022,000 | Variable(2) | Group 1-2 Senior Support |
| 1-2IO | N/A(3) | 0.850%(4) | Group 1-2 Senior Interest Only |
| 1-A3A | 47,142,000 | Variable(2) | Group 1-3 Super Senior |
| 1-A3B | 2,707,000 | Variable(2) | Group 1-3 Senior Support |
| 1-B1 | 13,588,000 | Variable(2) | Group 1 Subordinate |
| 1-B2 | 2,561,000 | Variable(2) | Group 1 Subordinate |
| 1-B3 | 1,575,000 | Variable(2) | Group 1 Subordinate |
| 1-R | 100 | Variable(2) | Group 1 Residual |
| 2-A1A | 436,616,000 | Variable(2) | Group 2 Super Senior |
| 2-A1B | 21,855,000 | Variable(2) | Group 2 Senior Support |
| 2-B1 | 12,248,000 | Variable(2) | Group 2 Subordinate |
| 2-B2 | 3,603,000 | Variable(2) | Group 2 Subordinate |
| 2-B3 | 2,161,000 | Variable(2) | Group 2 Subordinate |
| 2-R | 100 | Variable(2) | Group 2 Residual |

[1] Approximate; subject to a permitted variance of plus or minus 5%.
[2] Calculated as described under "Description of the Certificates—Pass-Through Rates" in this prospectus supplement.



**Certified Forensic Loan Auditors**

(3) This class of certificates is an interest only certificate and will not have a certificate principal balance. This class of certificates will accrue interest on the notional amount thereof. The notional amount of this class of certificates will be calculated for each distribution date as described under "Description of the Certificates—Glossary."
(4) This class of certificates will accrue interest at this pass-through rate for a specified number of accrual periods described under "Description of the Certificates—Pass-Through Rates" in this prospectus supplement. Thereafter, the pass-through rate for such class of certificates will be 0.500% per annum
http://www.secinfo.com/dqTm6.u1uf.htm#1stPage

## AFFILIATIONS AND RELATED TRANSACTIONS

The depositor and the underwriter are direct wholly-owned subsidiaries of Citigroup Financial Products, Inc. The paying agent, certificate registrar, authenticating agent, and Citibank, N.A. in its capacity as custodian is a direct wholly-owned subsidiary of Citicorp Holdings Inc. The master servicer and trust administrator is a direct wholly-owned subsidiary of Citigroup Inc. Citigroup Financial Products Inc. and Citicorp Holdings Inc. are both wholly owned subsidiaries of Citigroup Inc.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's length transaction with an unrelated third party, between (a) any of the sponsor, the depositor or the trust and (b) any of the master servicer, any servicer, the trust administrator, the paying agent, the certificate registrar, the authenticating agent, any custodian or any originator.

## USE OF PROCEEDS

The seller will sell the mortgage loans to the depositor, and the depositor will convey the mortgage loans to the trust in exchange for and concurrently with the delivery of the certificates. Net proceeds from the sale of the certificates will be applied by the depositor to the purchase of the mortgage loans from the seller. These net proceeds will represent the purchase price to be paid by the depositor to the seller for the mortgage loans. The seller will have acquired the mortgage loans prior to the sale of the mortgage loans to the depositor.

## THE MORTGAGE POOL

The statistical information presented in this prospectus supplement relates to the mortgage loans and related mortgaged properties in each collateral pool in the aggregate or in each loan group, as the case may be, as of the cut-off date, as adjusted for scheduled principal payments due on or before the cut-off date whether or not received. Prior to the issuance of the certificates, mortgage loans may be removed from the mortgage pool as a result of incomplete documentation or otherwise if the depositor deems such removal necessary or desirable. In addition, mortgage loans may be prepaid at any time. A limited number of other mortgage loans may be included in the mortgage pool prior to the issuance of the certificates unless including such mortgage loans would materially alter the characteristics of the mortgage loans in the mortgage pool as described in this prospectus supplement.

The depositor believes that the information set forth in this prospectus supplement with respect to the mortgage loans in each collateral pool in the aggregate and in each loan group will be representative of the characteristics of the mortgage loans in each collateral pool and each loan group as it will be constituted at the time the certificates are issued, although the range of mortgage rates and maturities and certain other characteristics of the mortgage loans may vary. Any statistic presented on a weighted average basis or any statistic based on the aggregate principal balance of the mortgage loans in any collateral pool or any loan group thereof is subject to a variance of plus or minus 5%.

If any material pool characteristic of the mortgage loans on the Closing Date differs by more than 5% or more from the description of the mortgage loans in this prospectus supplement, the depositor will file updated pool characteristics relating to such mortgage loans by Form 8-K within four days following the Closing Date.

Unless otherwise noted, with respect to the mortgage loans, all statistical percentages or weighted averages set forth in this prospectus supplement are measured as a percentage of the aggregate principal balance of such mortgage loans in the related loan group or in a particular collateral pool, as the context requires, as of the cut-off date.

**General**

The mortgage pool will consist of approximately 1,400 conventional, one- to four-family adjustable-rate mortgage loans secured by first liens on residential real properties and having an aggregate principal balance as of the cut-off date of approximately $874,223,047, after application of scheduled payments due on or before the cut-off date



**Certified Forensic Loan Auditors**

whether or not received and subject to a permitted variance of plus or minus 5%. The mortgage loans will have original terms to maturity of not greater than 40 years. Each of the mortgage loans in the mortgage pool will have been acquired by the seller directly or indirectly from the related originator.

The mortgage loans are secured by first mortgages or deeds of trust or other similar security instruments creating first liens on one- to four-family residential properties consisting of one- to four- family dwelling units, cooperatives, individual condominium units and planned unit developments. With respect to any mortgage loan secured by individual condominium units, the mortgage loan may not conform to the requirements of Fannie Mae and Freddie Mac regarding condominiums, and notwithstanding the provisions under "The Trust Funds" in the prospectus, neither the seller nor any originator will be required to represent the percentage of condominiums occupied as primary residences or vacation or second homes.

All of the mortgage loans have scheduled monthly payments due on the first day of the month and that day is referred to as the "due date" with respect to each mortgage loan. Each mortgage loan will contain a customary "due-on-sale" clause.

The mortgage loans will be divided into two primary loan groups, each referred to herein as a collateral pool, designated as Collateral Pool 1 and Collateral Pool 2.

The mortgage loans in Collateral Pool 1, referred to in this prospectus supplement as the Group 1 Mortgage Loans, will be further divided into three loan groups designated as loan Group 1-1, loan Group 1-2 and loan Group 1-3. The mortgage loans in loan Group 1-1 are referred to in this prospectus supplement as the Group 1-1 Mortgage Loans, the mortgage loans in loan Group 1-2 are referred to in this prospectus supplement as the Group 1-2 Mortgage Loans and the mortgage loans in loan Group 1-3 are referred to in this prospectus supplement as the Group 1-3 Mortgage Loans. The mortgage loans in Collateral Pool 2, referred to in this prospectus supplement as the Group 2 Mortgage Loans, have not been further divided into loan groups.

Each of the mortgage loans will have been originated by Countrywide Home Loans, Inc., GreenPoint Mortgage Funding, Inc. or Wells Fargo Bank, N.A., and will be primarily serviced by one of the servicers. See "The Servicers" in this prospectus supplement.

Approximately 0.36% of the Group 1 Mortgage Loans and none of the Group 2 Mortgage Loans will have original terms to maturity of 40 years. All other Group 1 Mortgage Loans and Group 2 Mortgage Loans will have original terms to maturity of not greater than 30 years.

The mortgage rate on each adjustable rate mortgage loan is the per annum rate of interest calculated as specified in the related mortgage note. Each mortgage loan provides for adjustment to the mortgage rates thereon and for corresponding adjustments to the monthly payment amount due thereon, in each case on each adjustment date applicable thereto. With respect to each Group 1 Mortgage Loan, the mortgage rate thereon is fixed for five years or seven years and then adjusts semi-annually or annually. With respect to each Group 2 Mortgage Loan, the mortgage rate thereon is fixed for five years and then adjusts annually.

Certain of the mortgage loans included in each collateral pool will be mortgage loans that only require the related mortgagor to pay interest on the principal balance of the mortgage loan for the first five years, seven years or ten years after its origination, but require that the entire principal balance of the mortgage loan be fully amortized over the related remaining term of the mortgage loan following such interest only period (such mortgage loans are referred to in this prospectus supplement as "Interest-Only Mortgage Loans"). The mortgage rate at which interest is calculated during the period in which only payments of interest are due may be fixed or adjustable or initially fixed and then adjustable. Approximately 90.37% of the Group 1 Mortgage Loans and approximately 93.15% of the Group 2 Mortgage Loans are Interest-Only Mortgage Loans. The following table sets forth the interest only period, the number of years to the first adjustment, the periodic rate adjustment period and the approximate percentage of Interest-Only Mortgage Loans in each loan group:

| Loan Group | Interest Only Period | Origination to First Adjustment Period | Periodic Rate Adjustment Period | % of Interest-Only Loans |
|---|---|---|---|---|
| Group 1 Mortgage Loans | 5 years, 7 years or 10 years | 5 years or 7 years | semi-annually or annually | 90.37% |
| Group 1-1 Mortgage Loans | 5 years or 10 years | 5 years | semi-annually or annually | 89.86% |
| Group 1-2 Mortgage Loans | 5 years or 10 years | 5 years | semi-annually or annually | 92.66% |
| Group 1-3 Mortgage Loans | 7 years or 10 years | 7 years | semi-annually or annually | 91.59% |
| Group 2 Mortgage Loans | 5 years or 10 years | 5 years | annually | 93.15% |



**Certified Forensic Loan Auditors**

On each adjustment date for each adjustable-rate mortgage loan, the mortgage rate thereon will be adjusted to equal the sum, rounded (if provided in the related mortgage note), of the index for such mortgage loan and a fixed percentage amount (or gross margin) subject to the periodic and lifetime limitations described below. See "The Indices" below.

The mortgage rate on each adjustable-rate mortgage loan will not exceed a specified maximum mortgage rate over the life of the mortgage loan or be less than a specified minimum mortgage rate over the life of the mortgage loan. In addition, each adjustable-rate mortgage loan is limited in the amount by which its mortgage rate can adjust on any one adjustment date, which limit is called the periodic rate cap. Due to the application of the periodic rate cap, if applicable, and the maximum mortgage rates, the mortgage rate on each adjustable-rate mortgage loan, as adjusted on any related adjustment date, may be less than the sum of the related index and the related gross margin, rounded as described in this prospectus supplement.

Effective with the first monthly payment due on each adjustable-rate mortgage loan after each related adjustment date, the monthly payment amount will be adjusted to an amount that will amortize fully the outstanding principal balance of the related mortgage loan over its remaining term (after the end of any applicable interest only period) and pay interest at the mortgage rate as so adjusted.

The earliest first payment date, earliest stated maturity date and latest stated maturity date of any mortgage loan is set forth in the following table:

| Loan Group | Earliest First Payment Date | Earliest Stated Maturity Date | Latest Stated Maturity Date |
|---|---|---|---|
| Group 1-1 Mortgage Loans | 12/1/2006 | 11/1/2036 | 6/1/2047 |
| Group 1-2 Mortgage Loans | 9/1/2006 | 8/1/2036 | 7/1/2037 |
| Group 1-3 Mortgage Loans | 4/1/2007 | 3/1/2037 | 7/1/2047 |
| Group 2 Mortgage Loans | 12/1/2003 | 11/1/2033 | 6/1/2037 |

The original loan-to-value ratio of a mortgage loan as described in this prospectus supplement is the ratio, expressed as a percentage, of the principal balance of the mortgage loan at origination over the value of the related mortgaged property determined at origination. For purposes of this calculation, the "value of the related mortgaged property" generally means, the lesser of the sales price of such mortgaged property and the appraised value of such mortgaged property, as such price or appraised value, as applicable, was determined in connection with the origination of such mortgage loan. There can be no assurance that the value of a mortgaged property used in the calculation of the loan-to-value ratio accurately reflected the actual value of the related mortgaged property at origination.

The "Relationship ARM" mortgage loan is a Wells Fargo Bank portfolio product that provides a reduced mortgage interest rate during the fixed-rate period to a mortgagor who has or establishes at the time of the origination of the mortgage loan certain banking relationships with Wells Fargo Bank. The amount of the reduction is based on the mortgagor maintaining certain accounts and balances. In the event a mortgagor fails to maintain the required relationship, Wells Fargo Bank may, upon notice, increase the mortgage interest rate for the fixed-rate period by a specified number of percentage points ranging from 0.125% to 0.500%. Approximately 0.05% of the Group 1 Mortgage Loans (by aggregate principal balance of the Group 1 Mortgage Loans as of the cut-off date), none the Group 1-1 Mortgage Loans, approximately 0.53% of the Group 1-2 Mortgage Loans (by aggregate principal balance of the Group 1-2 Mortgage Loans as of the cut-off date) and none of the Group 1-3 Mortgage Loans are Relationship ARM mortgage Loans. Approximately 14.57% of the Group 2 Mortgage Loans (by aggregate principal balance of the Group 2 Mortgage Loans of the as of the cut-off date) are Relationship ARM mortgage Loans. If, with respect to any Relationship ARM, the discount ends during the fixed-rate period and the borrower's rate increases, Wells Fargo Bank, and not the trust, will be entitled to the applicable additional interest accruing on the affected mortgage loan.



Certified Forensic Loan Auditors

## THE ORIGINATORS

Under the following subheadings is information about the mortgage loans originated by Countrywide Home Loans, Inc. in its capacity as an originator of mortgage loans included in Collateral Pool 1 and Wells Fargo Bank, N.A. in its capacity as the originator of the Mortgage Loans included in Collateral Pool 2. Each of GreenPoint Mortgage Funding, Inc. and Wells Fargo Bank, N.A. originated less than 20% of the mortgage loans in Collateral Pool 1. For information about the portion of each loan group originated by each originator, see "The Master Servicer and the Trust Administrator —General" in this prospectus supplement

## THE SERVICERS

**General**

Wells Fargo Bank will conduct the primary servicing for the master servicer with respect to approximately 5.47% of the Group 1 Mortgage Loans, none of the Group 1-1 Mortgage Loans, approximately 54.87% of the Group 1-2 Mortgage Loans, none of the Group 1-3 Mortgage Loans and 100.00% of the Group 2 Mortgage Loans (each, by aggregate principal balance of the applicable mortgage loans as of the cut-off date).

Each servicer will conduct such primary servicing pursuant to a servicing agreement. See "Summary of Prospectus Supplement — Servicers".

Each servicer will be responsible for the primary servicing of the related mortgage loans covered by the related servicing agreement, and pursuant to the pooling and servicing agreement the master servicer will be responsible that such servicing be conducted for the benefit of the trustee and the certificateholders as provided in the pooling and servicing agreement. In the event of a default by a servicer under the servicing agreement, the master servicer may enforce available remedies against such servicer, which might include finding a successor servicer or assuming the primary servicing obligations for the related mortgage loans itself.

Under the following headings is information about Countrywide Servicing which, as of the Cut-off Date, is conducting the primary servicing of 20% or more of the Mortgage Loans in Collateral Pool 1 and information about Wells Fargo Bank, N.A. which, as of the Cut-off Date, is conducting the primary servicing of 20% or more of the Mortgage Loans in Collateral Pool 2.

**Wells Fargo Bank, N.A.**
*Servicing Experience*

Wells Fargo Bank, N.A. ("Wells Fargo Bank") is an indirect, wholly-owned subsidiary of Wells Fargo & Company. Wells Fargo Bank is a national banking association and is engaged in a wide range of activities typical of a national bank. Wells Fargo Bank, including its predecessors, has many years of experience in servicing residential mortgage loans, commercial mortgage loans, auto loans, home equity loans, credit card receivables and student loans. Wells Fargo Bank, including its predecessors, has been servicing residential mortgage loans since 1974. These servicing activities, which include collections, loss mitigation, default reporting, bankruptcy, foreclosure and REO Property management, are handled at various Wells Fargo Bank locations including Frederick, Maryland, Fort Mill, South Carolina and other mortgage loan servicing centers. As of the date hereof, Wells Fargo Bank has not failed to make any required advance with respect to any issuance of residential mortgage backed securities.

Wells Fargo Bank's servicing portfolio of residential mortgage loans (which includes Prime 30-Year Fixed-Rate Relocation Loans, Prime 30-Year Fixed-Rate Non-Relocation Loans, Prime 15-Year Fixed-Rate Loans and Prime



Certified Forensic Loan Auditors

Adjustable-Rate Loans as well as other types of residential mortgage loans serviced by Wells Fargo Bank) has grown from approximately $450 billion as of the end of 2000 to approximately $1.37 trillion as of the end of 2006. The table below sets forth for each of the dates indicated the number and aggregate unpaid principal balance of mortgage loans serviced by Wells Fargo Bank (other than any mortgage loans serviced for Fannie Mae or Freddie Mac and certain mortgage loans serviced for the Federal Home Loan Banks, mortgage loans insured or guaranteed by the Government National Mortgage Association, Federal Housing Administration or Department of Veterans Affairs, or mortgage loans with respect to which Wells Fargo Bank has acquired the servicing rights, acts as subservicer, or acts as special servicer) for First Lien Non-Conforming, Non-Subprime Loans:

| | As of December 31, 2004 [1] | | As of December 31, 2005 [1] | | As of December 31, 2006 [2] | |
|---|---|---|---|---|---|---|
| | No. of Loans | Aggregate Unpaid Principal Balance of Loans | No. of Loans | Aggregate Unpaid Principal Balance of Loans | No. of Loans | Aggregate Unpaid Principal Balance of Loans |
| First Lien Non-Conforming, Non-Subprime Loans | 498,174 | $166,028,382,042 | 634,103 | $229,014,862,911 | 646,723 | $258,646,782,192 |

(1) Includes mortgage loans originated pursuant to Wells Fargo Bank's underwriting guidelines for "Alt-A minus" mortgage loans.
(2) Excludes mortgage loans originated pursuant to Wells Fargo Bank's underwriting guidelines for "Alt-A minus" mortgage loans.

*Servicing Procedures*

Shortly after the funding of a loan, various types of loan information are loaded into Wells Fargo Bank's automated loan servicing system. Wells Fargo Bank then makes reasonable efforts to collect all payments called for under the Mortgage Loan documents and will, consistent with the applicable servicing agreement and any pool insurance policy, primary mortgage insurance policy, bankruptcy bond or alternative arrangements, follow such collection procedures as are customary with respect to loans that are comparable to the Mortgage Loans. Wells Fargo Bank may, in its discretion, (i) waive any assumption fee, late payment or other charge in connection with a Mortgage Loan and (ii) to the extent not inconsistent with the coverage of such Mortgage Loan by a pool insurance policy, primary mortgage insurance policy, bankruptcy bond or alternative arrangements, if applicable, waive, vary or modify any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any matter grant indulgence to any borrower, subject to the limitations set forth in the applicable servicing agreement.

Wells Fargo Bank's collections policy is designed to identify payment problems sufficiently early to permit Wells Fargo Bank to address such delinquency problems and, when necessary, to act to preserve equity in a pre-foreclosure Mortgaged Property. Borrowers are billed on a monthly basis in advance of the due date. If a borrower attempts to use Wells Fargo Bank's Voice Response Unit ("VRU") to obtain loan information on or after a date on which a late charge is due, the VRU automatically transfers the call to the collection area. Collection procedures commence upon identification of a past due account by Wells Fargo Bank's automated servicing system. If timely payment is not received, Wells Fargo Bank's automated loan servicing system automatically places the Mortgage Loan in the assigned collection queue and collection procedures are generally initiated on the 16th day of delinquency. The account remains in the queue unless and until a payment is received, at which point Wells Fargo Bank's automated loan servicing system automatically removes the Mortgage Loan from that collection queue.

When a Mortgage Loan appears in a collection queue, a collector will telephone to remind the borrower that a payment is due. Follow-up telephone contacts with the borrower are attempted until the account is current or other payment arrangements have been made. When contact is made with a delinquent borrower, collectors present such borrower with alternative payment methods, such as Western Union, Phone Pay and Quick Collect, in order to expedite payments. Standard form letters are utilized when attempts to reach the borrower by telephone fail and/or in some circumstances, to supplement the phone contacts. Company collectors have computer access to telephone numbers, payment histories, loan information and all past collection notes. Wells Fargo Bank supplements the collectors' efforts with advanced technology such as predictive dialers and statistical behavioral software used to determine the optimal times to call a particular customer. Additionally, collectors may attempt to mitigate losses through the use of behavioral or other models or programs that are designed to assist in identifying workout options in the early stages of delinquency. For those loans in which collection efforts have been exhausted without success, Wells Fargo Bank determines whether



Certified Forensic Loan Auditors

foreclosure proceedings are appropriate. The course of action elected with respect to a delinquent Mortgage Loan generally will be guided by a number of factors, including the related borrower's payment history, ability and willingness to pay, the condition and occupancy of the Mortgaged Property, the amount of borrower equity in the Mortgaged Property and whether there are any junior liens.

Regulations and practices regarding the liquidation of properties (e.g., foreclosure) and the rights of a borrower in default vary greatly from state to state. As such, all foreclosures are assigned to outside counsel, licensed to practice in the same state as the Mortgaged Property. Bankruptcies filed by borrowers are similarly assigned to appropriate local counsel. Communication with foreclosure and bankruptcy attorneys is maintained through the use of a software program, thus reducing the need for phone calls and faxes and simultaneously creating a permanent record of communication. Attorney timeline performance is managed using quarterly report cards. The status of foreclosures and bankruptcies is monitored by Wells Fargo Bank through its use of such software system. Bankruptcy filing and release information is received electronically from a third-party notification vendor.

Prior to a foreclosure sale, Wells Fargo Bank performs a market value analysis. This analysis includes: (i) a current valuation of the Mortgaged Property obtained through a drive-by appraisal or broker's price opinion conducted by an independent appraiser and/or a broker from a network of real estate brokers, complete with a description of the condition of the Mortgaged Property, as well as other information such as recent price lists of comparable properties, recent closed comparables, estimated marketing time and required or suggested repairs, and an estimate of the sales price; (ii) an evaluation of the amount owed, if any, for real estate taxes; and (iii) estimated carrying costs, brokers' fees, repair costs and other related costs associated with real estate owned properties. Wells Fargo Bank bases the amount it will bid at foreclosure sales on this analysis.

If Wells Fargo Bank acquires title to a property at a foreclosure sale or otherwise, it obtains an estimate of the sale price of the property and then hires one or more real estate brokers to begin marketing the property. If the Mortgaged Property is not vacant when acquired, local eviction attorneys are hired to commence eviction proceedings and/or negotiations are held with occupants in an attempt to get them to vacate without incurring the additional time and cost of eviction. Repairs are performed if it is determined that they will increase the net liquidation proceeds, taking into consideration the cost of repairs, the carrying costs during the repair period and the marketability of the property both before and after the repairs.

Wells Fargo Bank's loan servicing software also tracks and maintains tax and homeowners' insurance information and tax and insurance escrow information. Expiration reports are generated periodically listing all policies scheduled to expire. When policies lapse, a letter is automatically generated and issued advising the borrower of such lapse and notifying the borrower that Wells Fargo Bank will obtain lender-placed insurance at the borrower's expense.

Wells Fargo Bank, in its capacity as servicer, has delivered its 2006 assessment of compliance under Item 1122 of Regulation AB. In its assessment, Wells Fargo Bank reported that it had complied, in all material respects, with the applicable servicing criteria set forth in Item 1122(d) of Regulation AB as of and for the year ended December 31, 2006 with respect to the primary servicing of residential mortgage loans by its Wells Fargo Home Mortgage Division, except for the following:

(i) For certain loans originated by third parties and sub-serviced by Wells Fargo Bank or for which servicing rights were acquired on a bulk-acquisition basis, Wells Fargo Bank determined it provided incomplete data to some third parties who use such data to calculate delinquency ratios and determine the status of loans with respect to bankruptcy, foreclosure or real estate owned. The incomplete reporting only affected securitizations that included delinquent loans. Instead of the actual due date being provided for use in calculating delinquencies, the date of the first payment due to the security was provided. Wells Fargo Bank subsequently included additional data in the monthly remittance reports, providing the actual borrower due date and unpaid principal balance, together with instructions to use these new fields if such monthly remittance reports are used to calculate delinquency ratios.

(ii) Wells Fargo Bank determined that, as required by certain servicing agreements, it did not provide mortgage loan purchasers with prior notifications of intent to foreclose. While mortgage loan purchasers received monthly delinquency status reports that listed loans in foreclosure, such reports were received after such loans had been referred to an attorney. A new process is being implemented to send such notifications if contractually required, unless an mortgage loan purchaser opts out in writing.



**Certified Forensic Loan Auditors**

## THE SPONSOR

The information set forth in the following paragraphs has been provided by Citigroup Global Markets Realty Corp.

Citigroup Global Markets Realty Corp., a New York corporation, is the sponsor of the transaction. The sponsor was organized in 1979 and is an affiliate of Citigroup Global Markets Inc. The sponsor maintains its principal office at 388 Greenwich Street, New York, New York 10013, Attention: Mortgage Finance Group. Its telecopy number is (212) 723-8604. The sponsor was established as a mortgage banking company to facilitate the purchase of whole loan portfolios and servicing rights containing various levels of quality from "investment quality" to varying degrees of "non-investment quality" up to and including real estate owned assets.

Since its inception, the sponsor has purchased over $50 billion in residential whole loans and servicing rights, which include the purchase of newly originated Alt-A, jumbo (prime) and sub-prime mortgage loans. Mortgage loans are purchased on a bulk and flow basis. Mortgage loans are generally purchased with the ultimate strategy of securitization into a securitization based upon product type and credit parameters.

Mortgage loans acquired by the sponsor are subject to varying levels of due diligence prior to purchase. Portfolios may be reviewed for credit, data integrity, appraisal valuation, documentation, as well as compliance with certain laws. Mortgage loans purchased will have been originated pursuant to the related originator's underwriting guidelines that are acceptable to the sponsor.

Subsequent to purchase by the sponsor, mortgage loans are pooled together by product type and credit parameters and structured into a securitization, with the assistance of Citigroup Global Markets Inc., for distribution into the primary market.

The sponsor has been securitizing residential mortgage loans since 1987. The following table describes size, composition and growth of the sponsor's total portfolio of assets it has securitized as of the dates indicated.

| Loan Type | December 31, 2003 Total Portfolio of Loans | December 31, 2004 Total Portfolio of Loans | December 31, 2005 Total Portfolio of Loans | December 31, 2006 Total Portfolio of Loans |
|---|---|---|---|---|
| Prime / Alt-A | $2,122,000,000 | $4,310,000,000 | $ 9,804,000,000 | $10,909,678,524 |
| Reperforming | $ 552,000,000 | $ 406,000,000 | $ 309,000,000 | $ 277,332,000 |
| SubPrime | $ 306,000,000 | $2,426,000,000 | $ 8,246,000,000 | $10,308,594,000 |
| Totals | $2,980,000,000 | $7,142,000,000 | $18,359,000,000 | $21,495,604,524 |

With respect to some of the securitizations organized by the sponsor, a trigger event has occurred with respect to the loss and delinquency experience of the mortgage loans included in the related trust, resulting in a sequential payment of principal to the related Offered Certificates, from the certificate with the highest credit rating to the one with the lowest rating.

## THE DEPOSITOR

Citigroup Mortgage Loan Trust Inc., a Delaware corporation, is the depositor of the transaction. The depositor was organized in 2003 and is an affiliate of Citigroup Global Markets Inc. The depositor maintains its principal office at 390 Greenwich Street, New York, New York 10013, Attention: Mortgage Finance Group. Its telecopy number is (212) 723-8604.

The depositor has been engaged in the securitization of mortgage loans since its incorporation in 2003, although the sponsor has been engaged in the securitization of mortgage loans through other depositors since 1987. The depositor is generally engaged in the business of acting as a depositor of one or more trust funds that may issue or cause to be issued, sell and deliver bonds or other evidences of indebtedness or certificates of interest that are secured by, or represent an interest in mortgage loans. The depositor typically acquires mortgage loans and other assets for inclusion in securitizations from the related sponsor or an affiliate thereof.



Certified Forensic Loan Auditors

The certificate of incorporation of the depositor provides that the depositor may not conduct any activities other than those related to the issue and sale of one or more series of securities and to act as depositor of trusts that may issue and sell securities.

After the issuance of the notes, the depositor will have limited or no obligations with respect to the notes and the trust fund. Those obligations may include appointing replacements to certain transaction participants, preparing and filing required reports under the Securities Exchange Act of 1934, as amended, providing notices to certain parties under the pooling and servicing agreement or providing requested information to the various transaction participants.

The depositor does not have, nor is it expected in the future to have, any significant assets. We do not expect that the depositor will have any business operations other than acquiring and pooling residential mortgage loans, mortgage securities and agency securities, offering mortgage-backed or other asset-backed securities, and related activities.

## THE ISSUING ENTITY

Citigroup Mortgage Loan Trust 2007-AR8, will be a New York common law trust established pursuant to the pooling and servicing agreement. The issuing entity will not own any assets other than the mortgage loans and the other assets described under "Pooling and Servicing Agreement—General." The issuing entity will not have any liabilities other than those incurred in connection with the pooling and servicing agreement and any related agreement. The issuing entity will not have any directors, officers, or other employees. No equity contribution will be made to the issuing entity by the sponsor, the depositor or any other party, and the issuing entity will not have any other capital. The fiscal year end of the issuing entity will be December 31. The issuing entity will act through the trustee, the master servicer and the trust administrator.

## POOLING AND SERVICING AGREEMENT

### General

The certificates will be issued pursuant to the pooling and servicing agreement, dated as of July 1, 2007, among the depositor, the master servicer, the trust administrator, the trustee and Citibank, a form of which is filed as an exhibit to the registration statement. A current report on Form 8-K relating to the certificates containing a copy of the pooling and servicing agreement as executed will be filed by the depositor with the Securities and Exchange Commission following the initial issuance of the certificates. The trust created under the pooling and servicing agreement will consist of (i) all of the depositor's right, title and interest in and to the mortgage loans, the related mortgage notes, mortgages and other related documents; (ii) all payments on or collections in respect of the mortgage loans due after the cut-off date, together with any proceeds thereof; (iii) any mortgaged properties acquired on behalf of certificateholders by foreclosure or by deed-in-lieu of foreclosure, and any revenues received thereon; (iv) the rights of the trustee under all insurance policies required to be maintained pursuant to the pooling and servicing agreement; and (v) the rights of the depositor under the mortgage loan purchase agreement pursuant to which the depositor acquired the mortgage loans from the seller.

Reference is made to the prospectus for important information in addition to that set forth in this prospectus supplement regarding the trust, the terms and conditions of the pooling and servicing agreement and the Offered Certificates. The depositor will provide to a prospective or actual certificateholder without charge, on written request, a copy, without exhibits, of the pooling and servicing agreement. Requests should be addressed to the Secretary, Citigroup Mortgage Loan Trust Inc., 390 Greenwich Street, 6th Floor, New York, New York 10013. The depositor will provide to a prospective or actual certificateholder without charge, on written request, a copy, without exhibits, of the pooling and servicing agreement. Requests should be addressed to the Secretary, Citigroup Mortgage Loan Trust Inc., 390 Greenwich Street, 4th Floor, New York, New York 10013.

### Assignment of the Mortgage Loans

Pursuant to one or more sale agreements, each originator sold the mortgage loans originated by it, directly or indirectly, without recourse, to the seller. Pursuant to a mortgage loan purchase agreement, the seller will sell, transfer, assign, set over and otherwise convey the mortgage loans, without recourse, to the depositor on the closing date. Pursuant to the pooling and servicing agreement, the depositor will sell, transfer, assign, set over and otherwise convey all of the mortgage loans, without recourse, to the trustee, for the benefit of the certificateholders, on the closing date.



Certified Forensic Loan Auditors

The depositor will deliver or cause to be delivered to the trustee, or to a custodian on behalf of the trustee, with respect to each mortgage loan, among other things: the mortgage note endorsed in blank, the original mortgage with evidence of recording indicated thereon and an assignment of the mortgage in blank.

The assignments of mortgage will not be recorded in the offices for real property records, except as set forth in the pooling and servicing agreement.

Pursuant to the related sale agreement, the originator made and/or will make certain representations and warranties to the seller relating to, among other things, certain characteristics of the mortgage loans being sold by such party. Subject to certain limitations contained in the related sale agreement, the originator will be obligated to repurchase or substitute a similar mortgage loan for any mortgage loan as to which there exists uncured deficient documentation or an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the value of such mortgage loan or the interests of the certificateholders in such mortgage loan.

Pursuant to the mortgage loan purchase agreement, the seller will make certain representations and warranties regarding the mortgage loans. Subject to certain limitations contained in the mortgage loan purchase agreement, the seller will be obligated to repurchase or substitute a similar mortgage loan for any mortgage loan as to which there exists an uncured breach of any such representation or warranty, if such breach of any such representation or warranty materially and adversely affects the value of such mortgage loan or the interests of the certificateholders in such mortgage loan.

The seller is selling, and the originator sold, the mortgage loans without recourse and neither the seller nor the originator will have any obligation with respect to the certificates, other than the cure, repurchase or substitution obligations described above and certain limited indemnification obligations. The depositor will not make any loan level representations and warranties and will not therefore have any cure, repurchase or substitution obligations with respect to any loan level representation or warranty.

The assignments of mortgage will not be recorded in the offices for real property records, except as set forth in the pooling and servicing agreement.

**The Master Servicer and Trust Administrator**

CitiMortgage, Inc. ("CitiMortgage") will act as master servicer and trust administrator pursuant the pooling and servicing agreement. The information set forth in the following paragraphs has been provided by CitiMortgage.

Citigroup, Inc. is the ultimate parent of CitiMortgage, a New York corporation. CitiMortgage provides mortgage services throughout the United States. As of December 31, 2006, CitiMortgage held approximately $467 billion in mortgage servicing, with 3.2 million customers and 11,000 employees; CitiMortgage began originating mortgage loans in 1979. CitiMortgage derives income primarily from interest on mortgages that it owns, secondary market mortgage sales, and mortgage loan servicing fees, and mortgage origination fees and charges. The depositor, the master servicer and the paying agent are also subsidiaries of Citigroup, Inc. The trust administrator's principal office for notices is located at 1000 Technology Drive, O'Fallon, MO 63368, Attention: Mortgage Finance MS 337, and its telephone number is 636-261-1313. The master servicer's principal office is 4000 Regent Blvd., Irving, TX 75063, Attention: Master Servicing Compliance, and its telephone number is 469-220-0916.

*Master Servicer.* CitiMortgage will act as master servicer pursuant to the pooling and servicing agreement. The master servicer will be responsible for the aggregation of monthly servicer reports and remittances and for the oversight of the performance of the servicer under the terms of the pooling and servicing agreement. In particular, the master servicer will independently calculate monthly loan balances based on servicer data, compare its results to servicer loan-level reports and reconcile any discrepancies with the servicer. The master servicer will also review the servicing of defaulted mortgage loans for compliance with the terms of the pooling and servicing agreement. In addition, upon the occurrence of certain servicer events of default under the terms of the pooling and servicing agreement, the master servicer will be required to enforce certain remedies on behalf of the trust against the defaulting servicer. CitiMortgage has been engaged in the business of master servicing since March 1, 2003 when it acquired the operations of First Nationwide Mortgage Corp. through merger. As of December 31, 2006, CitiMortgage was acting as master servicer for approximately 31 series of residential mortgage-backed securities with an aggregate outstanding principal balance of approximately $21,256,000,000. The master servicer will be indemnified by the trust fund for certain expenses as provided in the pooling and servicing agreement and as described in the prospectus.

*Trust Administrator.* Pursuant to the terms of the pooling and servicing agreement, the trust administrator will be responsible for trust administration, which includes pool performance calculations, distribution calculations and the preparation of monthly distribution reports. As trust administrator, CitiMortgage will be responsible for the preparation

Page | 16



Certified Forensic Loan Auditors

and filing of all REMIC tax returns on behalf of the trust REMICs, if a REMIC election is made, and the preparation of monthly reports on Form 10-D in regards to Distribution and Pool Performance Information and annual reports on Form 10-K that are required to be filed with the Securities and Exchange Commission on behalf of the issuing entity. CitiMortgage has been engaged in the business of trust administration since October 1987. As of December 31, 2006, CitiMortgage was acting as trust administrator with respect to more than $110,638,189,000 (aggregate initial principal balance) of issued residential mortgage-backed and asset-backed securities with aggregate principal balance remaining outstanding of approximately $49,389,669,000. The trust will provide certain indemnifications to the trust administrator which may reduce amounts otherwise distributable to certificateholders. See "Indemnification of the Trustee, the Trust Administrator, Citibank and any Custodian" below.

The principal compensation to be paid to CitiMortgage in respect of its obligations as master servicer and trust administrator under the pooling and servicing agreement will be equal to certain investment earnings on the amounts on deposit in the certificate account.

**The Trustee**

The information set forth in the next four paragraphs below has been provided by U.S. Bank National Association.

U.S. Bank National Association ("U.S. Bank") will act as Trustee. U.S. Bank is a national banking association and a wholly-owned subsidiary of U.S. Bancorp, which is currently ranked as the sixth largest bank holding company in the United States with total assets exceeding $221 billion as of March 31, 2007. As of March 31, 2007, U.S. Bancorp served approximately 14.2 million customers, operated 2,498 branch offices in 24 states and had over 50,000 employees. A network of specialized U.S. Bancorp offices across the nation, inside and outside its 24-state footprint, provides a comprehensive line of banking, brokerage, insurance, investment, mortgage, trust and payment services products to consumers, businesses, governments and institutions.

U.S. Bank has one of the largest corporate trust businesses in the country with offices in 46 U.S. cities. The pooling and servicing agreement will be administered from U.S. Bank's corporate trust office located at One Federal Street, Boston, MA 02110.

U.S. Bank has provided corporate trust services since 1924. As of March 31, 2007, U.S. Bank was acting as trustee with respect to over 81,000 issuances of securities with an aggregate outstanding principal balance of over $2.2 trillion. This portfolio includes corporate and municipal bonds, mortgage-backed and asset-backed securities and collateralized debt obligations.

As of March 31, 2007, U.S. Bank (and its affiliate U.S. Bank Trust National Association) was acting as trustee 727 issuances of MBS/Sub-Prime securities with an outstanding aggregate principal balance of approximately $363,524,800,000.

As compensation to the trustee in respect of its obligations under the pooling and servicing agreement, the trustee's fees will be paid by the trust administrator pursuant to a separate agreement between the trustee and the trust administrator, and such compensation will not be an expense of the trust.

The trust will provide certain indemnifications to the trustee which may reduce amounts otherwise distributable to certificateholders. See "Indemnification of the Trustee, the Trust Administrator, Citibank and any Custodian" below.

**The Paying Agent, Certificate Registrar and Authenticating Agent**

The information set forth in the first two paragraphs below has been provided by Citibank, N.A.

The paying agent, certificate registrar and authenticating agent is Citibank, N.A., a national banking association and wholly owned subsidiary of Citigroup Inc., a Delaware corporation. Citibank, N.A. performs as paying agent through the Agency and Trust line of business, which is part of the Global Transaction Services division. Citibank, N.A. has primary corporate trust offices located in both New York and London. Citibank, N.A. is a leading provider of corporate trust services offering a full range of agency, fiduciary, tender and exchange, depositary and escrow services. As of the end of the second quarter of 2007, Citibank's Agency and Trust group manages in excess of $4.1 trillion in fixed income and equity investments on behalf of approximately 2,500 corporations worldwide. Since 1987, Citibank Agency and Trust has provided trust services for asset-backed securities containing pool assets



Certified Forensic Loan Auditors

consisting of airplane leases, auto loans and leases, boat loans, commercial loans, commodities, credit cards, durable goods, equipment leases, foreign securities, funding agreement backed note programs, truck loans, utilities, student loans and commercial and residential mortgages. As of the end of the second quarter of 2007, Citibank, N.A. acts as trustee and/or paying agent for approximately 400 various residential mortgage-backed transactions. Citibank's offices for notices under the pooling and servicing agreement are located 388 Greenwich Street, 14th Floor, New York, New York 10013, Attention: Citibank Agency & Trust, and its telephone number is (212) 816-5680.

As compensation to Citibank in respect of its obligations under the pooling and servicing agreement, Citibank's fees will be paid by the trust administrator pursuant to a separate agreement between Citibank and the trust administrator, and such compensation will not be an expense of the trust.

The trust will provide certain indemnifications to Citibank which may reduce amounts otherwise distributable to certificateholders. See "—Indemnification of the Trustee, the Trust Administrator, Citibank and any Custodian" below.

**The Custodians**
*Citibank, N.A.*

The information set forth in the following paragraphs has been provided by Citibank, N.A.

Citibank, N.A., a national banking association, referred to in this prospectus supplement as Citibank or the custodian, will act as custodian for certain of the mortgage notes pursuant to a custodial agreement. Such custodian will perform certain administrative functions on behalf of the trust administrator. Such custodian's offices for notices under the related custodial agreement are located at 5280 Corporate Drive, Frederick, Maryland 21703, Attention: Citibank, N.A Custodial Operations.

Citibank, N.A. in its capacity as custodian will hold certain of the mortgage notes, mortgages and other legal documents in the mortgage files for the benefit of the certificateholders. Such custodian will maintain the mortgage files held by it in secure and fire-resistant facilities. These mortgage files will not be physically segregated from other mortgage files in such custodian's custody but will be kept in shared facilities. However, such custodian's proprietary document tracking system will show the location within such custodian's facilities of each mortgage file held by it and will show that the mortgage loan documents are held by such custodian on behalf of the trust. Citibank, N.A. in its capacity as a custodian will review each mortgage file held by it in accordance with the review criteria specified in the pooling and servicing agreement and deliver a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

*Wells Fargo Bank, N.A.*

The information set forth in the following paragraph has been provided by Wells Fargo Bank, N.A.

Wells Fargo Bank is acting as custodian of certain of the mortgage loan files pursuant to the pooling and servicing agreement. In that capacity, Wells Fargo Bank is responsible to hold and safeguard the mortgage notes and other contents of the mortgage files held by it on behalf of the trustee and the certificateholders. Wells Fargo Bank maintains each mortgage loan file held by it in a separate file folder marked with a unique bar code to assure loan-level file integrity and to assist in inventory management. Files are segregated by transaction or investor. Wells Fargo Bank has been engaged in the mortgage document custody business for more than 25 years. Wells Fargo Bank maintains document custody facilities in its Minneapolis, Minnesota headquarters and in three regional offices located in Richfield, Minnesota, Irvine, California, and Salt Lake City, Utah. As of December 31, 2006, Wells Fargo Bank maintains mortgage custody vaults in each of those locations with an aggregate capacity of over eleven million files.

**Payments on Mortgage Loans**

Each servicer will maintain a custodial account for the benefit of the trust and owners of other mortgage loans, not in the trust, serviced by the servicer. The master servicer will establish and maintain or cause to be established and maintained a separate trust account (the "Collection Account") for the benefit of the certificateholders. The Collection Account will be an Eligible Account (as defined in the pooling and servicing agreement). Upon receipt by the master servicer of amounts in respect of the mortgage loans (excluding amounts representing the servicing fees or other servicing compensation, reimbursement for P&I Advances and servicing advances and insurance proceeds to be applied to the restoration or repair of a mortgaged property or similar items), the master servicer will deposit such amounts in the Collection Account. Amounts so deposited may be invested in permitted investments (as defined in the pooling and servicing agreement) maturing no later than one business day prior to the date on which the amount on deposit therein is required to be deposited in the Distribution Account. The paying agent will establish an account (the "Distribution Account") into which will be deposited amounts withdrawn from the Collection Account for distribution to



Certified Forensic Loan Auditors

certificateholders on a distribution date and payment of certain fees and expenses of the trust. The Distribution Account will be an Eligible Account. Amounts on deposit therein may be invested in permitted investments maturing on or before the business day prior to the related distribution date unless such permitted investments are invested in investments managed or advised by the trust administrator or an affiliate thereof, in which case such permitted investments may mature on the related distribution date.

## Events of Default and Removal of Master Servicer

The circumstances under which the master servicer may be removed are set forth under "Description of the Securities—Events of Default and Rights upon Events of Default" in the prospectus.

In the event of an event of default regarding the master servicer, the trustee or another successor will become the successor master servicer under the pooling and servicing agreement (or, the trustee may, if it shall be unwilling to continue to so act, or shall, if it is unable to so act, petition a court of competent jurisdiction to appoint any established housing and home finance institution servicer, servicing or mortgage servicing institution having a net worth of not less than $15,000,000 and meeting such other standards for a successor servicer as are set forth in the pooling and servicing agreement).

The trustee will be required to notify certificateholders and the rating agencies of any event of a default by the master servicer actually known to a responsible officer of the trustee and of the appointment of any successor master servicer.

All reasonable out-of-pocket servicing transfer costs are required to be paid by the predecessor master servicer, upon presentation of reasonable documentation of such costs, and if such predecessor master servicer defaults in its obligation to pay such costs, such costs are required to be paid by the successor master servicer or the trustee (in which case the successor master servicer or the trustee, as applicable, will be entitled to reimbursement therefor from the assets of the trust).

## Indemnification of the Trustee, the Trust Administrator, Citibank and any Custodian

The pooling and servicing agreement will provide that the trustee, the trust administrator, Citibank and any director, officer, employee or agent of the trustee, the trust administrator or Citibank will be indemnified by the trust and will be held harmless against any loss, liability or expense (not including expenses, disbursements and advances incurred or made by the trustee, the trust administrator or Citibank, as applicable, including the compensation and the expenses and disbursements of such party's agents and counsel, in the ordinary course of such party's performance in accordance with the provisions of the pooling and servicing agreement) incurred by the trustee, the trust administrator or Citibank, as applicable, arising out of or in connection with the acceptance or administration of its obligations and duties under the pooling and servicing agreement, other than any loss, liability or expense (i) resulting from a breach of the master servicer's obligations and duties under the pooling and servicing agreement or the servicer' obligations and duties under the servicing agreement, for which the trustee, the trust administrator or Citibank, as applicable, is indemnified by the master servicer under the pooling and servicing agreement or the servicer under the related servicing agreement, as the case may be or (ii) incurred by reason of willful misfeasance, bad faith or negligence of the trustee, the trust administrator or Citibank, as applicable, in the performance of its duties under the pooling and servicing agreement or by reason of the reckless disregard by the trustee, the trust administrator or Citibank, as applicable, of its obligations and duties under the pooling and servicing agreement or as a result of a breach by the trustee, the trust administrator or Citibank, as applicable, of certain of its obligations or covenants under the pooling and servicing agreement with respect to REMIC administration or REMIC protection. The pooling and servicing agreement will provide that amounts owing from the trust to the trustee, the trust administrator or Citibank in respect of the foregoing indemnification may be withdrawn and paid to the trustee, the trust administrator or Citibank, as applicable, prior to the making of distributions to certificateholders. In addition, any custodian of the mortgage files will be indemnified by the trust to the same degree as the trustee or the trust administrator would be indemnified as described above were it performing custodian functions itself pursuant to the pooling and servicing agreement.

The trustee, trust administrator, paying agent, certificate registrar and authenticating agent will not be liable under the pooling and servicing agreement:

- with respect to the trustee, except for the performance of such duties and obligations as are specifically specified in the pooling and servicing agreement prior to the occurrence of a master servicer event of default and after the curing of such master servicer event of default, and with respect to the trust administrator, the paying agent, the certificate registrar and the authenticating agent, at all times, except for the performance of such duties and obligations as are specifically set forth in the pooling and servicing agreement;



Certified Forensic Loan Auditors

- for an error of judgment made in good faith by a responsible officer of the trustee, the trust administrator, the paying agent, the certificate registrar or the authenticating agent, as applicable, unless it is proved that the it was negligent in ascertaining the pertinent facts;
- for any action taken or omitted by it in good faith in accordance with the direction of the holders of related certificates evidencing at least 25% of the voting rights relating to the time, method and place of conducting any proceeding for any remedy available to the trustee or the trust administrator, as applicable, or exercising of any trust or power conferred upon the it, under the pooling and servicing agreement; or
- to expend or risk its own funds or otherwise incur financial liability in the performance of its duties or in the exercise of any of its rights or powers, if it has reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

The trustee shall not be required to take notice or be deemed to have notice or knowledge of any default unless a responsible officer of the trustee shall have received written notice thereof or a responsible officer shall have actual knowledge thereof. In the absence of receipt of such notice or actual knowledge, the trustee may conclusively assume there is no default.

Each of the trustee, the trust administrator, the paying agent, the certificate registrar or the authenticating agent, and any director, officer, employee or agent of the trustee, the trust administrator, the paying agent, the certificate registrar or the authenticating agent, as the case may be, may request and conclusively rely upon and shall be fully protected in acting or refraining from acting upon any resolution, officers' certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties. Each of the trustee, the trust administrator, the paying agent, the certificate registrar and the authenticating agent may consult with counsel of its selection and any opinion of counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it in good faith and in accordance with such opinion of counsel.

## FEDERAL INCOME TAX CONSEQUENCES

One or more elections will be made to treat designated portions of the trust as a real estate mortgage investment conduit, or REMICs, for federal income tax purposes. Upon the issuance of the Offered Certificates, Thacher Proffitt & Wood LLP, counsel to the depositor, will deliver its opinion generally to the effect that, assuming compliance with all provisions of the pooling and servicing agreement, for federal income tax purposes, the REMICs created under the pooling and servicing agreement will qualify as a REMIC under Sections 860A through 860G of the Code.

For federal income tax purposes, (i) the Residual Certificates will represent the sole class of "residual interests" in related REMICs elected by the trust and (ii) the Certificates other than the Residual Certificates will represent ownership of "regular interests" in, and generally will be treated as debt instruments of the REMICs. See "Federal Income Tax Consequences—REMICs—Classification of REMICs" in the prospectus.

For federal income tax reporting purposes, the Interest Only Certificates, the Class 1-B1 Certificates, the Class 1-B2 Certificates, Class 1-B3 Certificates, the Class 2-B1 Certificates, the Class 2-B2 Certificates and the Class 2-B3 Certificates will, and the remaining classes of Offered Certificates (other than the Residual Certificates) will not, be treated as having been issued with original issue discount. The prepayment assumption that will be used in determining the rate of accrual of original issue discount, premium and market discount, if any, for federal income tax purposes will be based on the assumption that, subsequent to the date of any determination, the mortgage loans will prepay at a rate corresponding to the Prepayment Assumption. No representation is made that the mortgage loans will prepay at that rate or at any other rate. See "Federal Income Tax Consequences —REMICs —Taxation of Owners of REMIC Regular Certificates—Original Issue Discount" in the prospectus.

The Internal Revenue Service, or IRS, has issued OID regulations under Sections 1271 to 1275 of the Code generally addressing the treatment of debt instruments issued with original issue discount.

If the method for computing original issue discount described in the prospectus results in a negative amount for any period with respect to a certificateholder, the amount of original issue discount allocable to that period would be zero and the certificateholder will be permitted to offset that negative amount only against future original issue discount, if any, attributable to those certificates.



Certified Forensic Loan Auditors

The Offered Certificates may be treated for federal income tax purposes as having been issued with a premium. Certificateholders may elect to amortize such premium under a constant yield method in which case such amortizable premium will generally be allocated among the interest distributions on such certificates and will be applied as an offset against the interest distributions. See "Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Regular Certificates—Premium" in the prospectus.

The Offered Certificates will be treated as assets described in Section 7701(a)(19)(C) of the Code and "real estate assets" under Section 856(c)(5)(B) of the Code, generally in the same proportion that the assets in the related trust fund would be so treated. In addition, interest on the Offered Certificates will be treated as "interest on obligations secured by mortgages on real property" under Section 856(c)(3)(B) of the Code, generally to the extent that the Offered Certificates are treated as "real estate assets" under Section 856(c)(5)(B) of the Code. The Offered Certificates (other than the Residual Certificates) also will be treated as "qualified mortgages" under Section 860G(a)(3) of the Code. See "Federal Income Tax Consequences—REMICs—Characterization of Investments in REMIC Certificates" in the prospectus.

It is not anticipated that the REMIC will engage in any transactions that would subject it to the prohibited transactions tax as defined in Section 860F(a)(2) of the Code, the contributions tax as defined in Section 860G(d) of the Code or the tax on net income from foreclosure property as defined in Section 860G(c) of the Code. However, in the event that any such tax is imposed on the REMIC, the tax will be borne (i) by the trustee, if the trustee has breached its obligations with respect to REMIC compliance under the pooling and servicing agreement, (ii) by the trust administrator (or Citibank, as applicable), if the trust administrator or Citibank on its behalf has breached its obligations with respect to REMIC compliance under the pooling and servicing agreement, (iii) by the master servicer, if the master servicer has breached its obligations with respect to REMIC compliance under the pooling and servicing agreement, (iv) by the servicer, if the servicer has breached its obligations with respect to REMIC compliance under the related servicing agreement, or (v) otherwise by the trust fund, with a resulting reduction in amounts otherwise distributable to holders of the certificates. See "Description of the Securities—General" and "Federal Income Tax Consequences—REMICs— Prohibited Transactions Tax and Other Taxes" in the prospectus.

The responsibility for filing annual federal information returns and other reports will be generally borne by the trust administrator. See "Federal Income Tax Consequences—REMICs—Reporting and Other Administrative Matters" in the prospectus.

For further information regarding the federal income tax consequences of investing in the Offered Certificates, see "Federal Income Tax Consequences—REMICs" in the prospectus.

**Special Tax Considerations Applicable to Residual Certificates**

The IRS has issued REMIC regulations under the provisions the Code that significantly affect holders of Residual Certificates. The REMIC regulations impose restrictions on the transfer or acquisition of some residual interests, including the Residual Certificates. The pooling and servicing agreement includes other provisions regarding the transfer of Residual Certificates, including (i) the requirement that any transferee of a Residual Certificate provide an affidavit representing that the transferee is not a disqualified organization; is not acquiring the Residual Certificate on behalf of a disqualified organization; and will maintain that status and will obtain a similar affidavit from any person to whom the transferee shall subsequently transfer a Residual Certificate; (ii) a provision that any transfer of a Residual Certificate to a disqualified organization shall be null and void; and (iii) a grant to the servicer of the right, without notice to the holder or any prior holder, to sell to a purchaser of its choice any Residual Certificate that will become owned by a disqualified organization despite the first two provisions above.

In addition, under the pooling and servicing agreement, the Residual Certificates may not be transferred to non-United States persons.

The REMIC regulations also provide that a transfer to a United States person of "noneconomic" residual interests will be disregarded for all federal income tax purposes, and that the purported transferor of "noneconomic" residual interests will continue to remain liable for any taxes due with respect to the income on the residual interests, unless "no significant purpose of the transfer was to impede the assessment or collection of tax." Based on the REMIC regulations, the Residual Certificates may constitute noneconomic residual interests during some or all of their terms for purposes of the REMIC regulations and, accordingly, unless no significant purpose of a transfer is to impede the assessment or collection of tax, transfers of the Residual Certificates may be disregarded and purported transferors may remain liable for any taxes due relating to the income on the Residual Certificates. All transfers of the Residual Certificates will be restricted in accordance with the terms of the pooling and servicing agreement that are intended to



Certified Forensic Loan Auditors

reduce the possibility of any transfer of a Residual Certificate being disregarded to the extent that the Residual Certificates constitute noneconomic residual interests.

The IRS has issued final REMIC regulations that add to the conditions necessary to assure that a transfer of a non-economic residual interest would be respected. The additional conditions require that in order to qualify as a safe harbor transfer of a residual interest, the transferee represent that it will not cause the income "to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the transferee or another U.S. taxpayer" and either (i) the amount received by the transferee be no less on a present value basis than the present value of the net tax detriment attributable to holding the residual interest reduced by the present value of the projected distributions to be received on the residual interest or (ii) the transfer is to a domestic taxable corporation with specified large amounts of gross and net assets and that meets certain other requirements where agreement is made that all future transfers will be to taxable domestic corporations in transactions that qualify for the same "safe harbor" provision. Eligibility for the safe harbor requires, among other things, that the facts and circumstances known to the transferor at the time of transfer not indicate to a reasonable person that the taxes with respect to the residual interest will not be paid, with an unreasonably low cost for the transfer specifically mentioned as negating eligibility. See "Federal Income Tax Consequences —REMICs —Taxation of Owners of REMIC Residual Certificates—Noneconomic REMIC Residual Certificates" in the prospectus.

Holders of the Residual Certificates may be required to report an amount of taxable income with respect to the earlier accrual periods of the term of each REMIC that significantly exceeds the amount of cash distributions received by the holders of the Residual Certificates with respect to those periods. Furthermore, the tax on that income may exceed the cash distributions with respect to those periods. Consequently, holders of the Residual Certificates should have other sources of funds sufficient to pay any federal income taxes due in the earlier years of the REMIC's term as a result of their ownership of the Residual Certificates. In addition, the required inclusion of this amount of taxable income during the REMIC's earlier accrual periods and the deferral of corresponding tax losses or deductions until later accrual periods or until the ultimate sale or disposition of a Residual Certificate, or possibly later under the "wash sale" rules of Section 1091 of the Internal Revenue Code may cause a Residual Certificate Certificateholders' after-tax rate of return to be zero or negative even if the Residual Certificateholders' pre-tax rate of return is positive. That is, on a present value basis, the Residual Certificateholders' resulting tax liabilities could substantially exceed the sum of any tax benefits and the amount of any cash distributions on the Residual Certificates over their life.

An individual, trust or estate that holds, whether directly or indirectly through pass-through entities, a Residual Certificate, may have significant additional gross income with respect to, but may be limited on the deductibility of, servicing fees, trustee's fees and other administrative expenses properly allocable to each REMIC in computing the certificateholder's regular tax liability and will not be able to deduct those fees or expenses to any extent in computing the certificateholder's alternative minimum tax liability. See "Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Residual Certificates—Possible Pass-Through of Miscellaneous Itemized Deductions" in the prospectus.

On May 11, 2004, the Internal Revenue Service issued final regulations relating to the federal income tax treatment of "inducement fees" received by transferees of non-economic REMIC residual interests. The regulations provide tax accounting rules for the inclusion of such fees in income over an appropriate period, and clarify that inducement fees represent income from sources within the United States. These rules apply to taxable years ending on or after May 11, 2004. On the same date, the IRS issued administrative guidance addressing the procedures by which transferees of such REMIC residual interests may obtain consent to change the method of accounting for REMIC inducement fee income to one of the methods provided in the regulations. Prospective purchasers of REMIC residual certificates should consult with their tax advisors regarding the effect of these regulations and the related administrative guidance.

Purchasers of the Residual Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment in the Residual Certificates.

For further information regarding the federal income tax consequences of investing in the Residual Certificates, see "Certain Yield and Prepayment Considerations—Additional Yield Considerations Applicable Solely to the Residual Certificates" in this prospectus supplement and "Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Residual Certificates" in the prospectus.



Certified Forensic Loan Auditors

## LEGAL OPINIONS

Legal matters relating to the Offered Certificates will be passed upon for the depositor and the underwriters by Thacher Proffitt & Wood llp, New York, New York

### Events of Default Under the Related Governing Documents May Result in Losses to the Related Securities.

Upon an event of default under a pooling and servicing agreement, the depositor or the trustee may, unless otherwise provided in the related prospectus supplement, and at the direction of holders of certificates evidencing not less than 51% of the voting rights, the trustee shall, terminate all of the rights and obligations of the master servicer under the pooling and servicing agreement relating to the trust fund and in and to the mortgage assets. **Upon an event of default under a servicing agreement, either the depositor or the trustee may, by written notification to the master servicer and to the issuer or the trustee or trust fund, as applicable, terminate all of the rights and obligations of the master servicer under the servicing agreement. Upon an event of default with respect to any series of notes issued under an indenture, the notes of the series have been declared to be due and payable, the trustee may, in its discretion (notwithstanding an acceleration of the related securities pursuant to the indenture), elect to maintain possession of the collateral securing the notes of the series and to continue to apply payments on the collateral as if there had been no declaration of acceleration if the collateral continues to provide sufficient funds for the payment of principal of and interest on the notes of the series as they would have become due if there had not been a declaration.** Any of the foregoing actions taken under the related governing documents pursuant to an event of default may result in losses to the related securities due to delays in the transfer of servicing from one entity to another or due to the liquidation of trust fund assets pursuant to an acceleration of the related securities. See "Description of the Securities-Events of Default under the Governing Agreement and Rights Upon Events of Default."

### Violations of Consumer Protection Laws May Result in Losses on the Mortgage Loans and the Securities Backed by Those Mortgage Loans

Federal and state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices:

- regulate interest rates and other charges on mortgage loans;
- require specific disclosures to borrowers;
- require licensing of originators; and
- regulate generally the origination, servicing and collection process for the mortgage loans.

Depending on the specific facts and circumstances involved, violations may limit the ability of a trust fund to collect all or a part of the principal of or interest on the mortgage loans, may entitle the borrower to a refund of amounts previously paid and could result in liability for damages and administrative enforcement against the originator or an assignee of the originator, like a trust fund, or the initial servicer or a subsequent servicer, as the case may be. **In particular, it is possible that mortgage loans included in a trust fund will be subject to the Home Ownership and Equity Protection Act of 1994. The Homeownership Act adds additional provisions to Regulation Z, the implementing regulation of the Federal Truth-In-Lending Act. These provisions impose additional disclosure and other requirements on creditors with respect to non-purchase money mortgage loans with high interest rates or high up-front fees and charges. In general, mortgage loans within the purview of the Homeownership Act have annual percentage rates over 8 percentage points for first lien loans or 10 percentage points for subordinate lien loans greater than the yield on Treasury securities of comparable maturity and/or fees and points which exceed the greater of 8% of the total loan amount or $480. The $480 amount is adjusted annually based on changes in the Consumer Price Index for the prior year. The provisions of the Homeownership Act apply on a mandatory basis to all mortgage loans originated on or after October 1, 1995. These provisions can impose specific statutory liabilities upon creditors who fail to comply with their provisions and may affect the enforceability of the related loans. In addition, any assignee of the creditor, like a trust fund, would generally be subject to all claims and defenses that the consumer could assert against the creditor, including the right to rescind the mortgage loan. Recently, class action lawsuits under the Homeownership Act have been brought naming as a defendant securitization trusts like the trust funds described in this prospectus with respect to the mortgage loans.**

Page | 23



Certified Forensic Loan Auditors

In addition, amendments to the federal bankruptcy laws have been proposed that could result in (1) the treatment of a claim secured by a junior lien in a borrower's principal residence as protected only to the extent that the claim was secured when the security interest was made and (2) the disallowance of claims based on secured debt if the creditor failed to comply with specific provisions of the Truth in Lending Act (15 U.S.C. ss.1639). These amendments could apply retroactively to secured debt incurred by the debtor prior to the date of effectiveness of the amendments.

In addition to the Homeownership Act, a number of legislative proposals have been introduced at both the federal and state level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels and require that borrowers be given certain disclosures prior to the consummation of the mortgage loans. In some cases, state law may impose requirements and restrictions greater than those in the Homeownership Act. An originator's failure to comply with these laws could subject the trust, and other assignees of the mortgage loans, to monetary penalties and could result in the borrowers rescinding the mortgage loans against either the trust or subsequent holders of the mortgage loans.

The depositor will represent that all applicable federal and state laws were complied with in connection with the origination of the mortgage loans. If there is a material and adverse breach of a representation, the depositor will be obligated to repurchase any affected mortgage loan or to substitute a new mortgage loan into the related trust fund. See "Legal Aspects of Mortgage Loans".

## ASSIGNMENT AND RECORDATION

### Assignment of Contracts

The depositor will cause the contracts to be assigned to the trustee, together with principal and interest due on or with respect to the contracts after the cut-off date, but not including principal and interest due on or before the cut-off date. If the depositor is unable to obtain a perfected security interest in a contract prior to transfer and assignment to the trustee, the mortgage loan seller will be obligated to repurchase the contract. The trustee, concurrently with each assignment, will authenticate and deliver the notes or certificates, as applicable. If a series of notes or certificates, as applicable, includes notes, the trust fund will be pledged by the issuer to the indenture trustee as security for the notes. Each contract will be identified in a schedule appearing as an exhibit to the related agreement. The contract schedule will specify, with respect to each contract, among other things: the original principal amount and the adjusted principal balance as of the close of business on the cut-off date, the annual percentage rate, the current scheduled monthly level payment of principal and interest and the maturity of the contract.

In addition, the depositor, as to each contract, will deliver or cause to be delivered to the trustee, or, as specified in the related prospectus supplement, the custodian, the original contract and copies of documents and instruments related to each contract and the security interest in the manufactured home securing each contract. In order to give notice of the right, title and interest of the certificate holders to the contracts, the depositor will cause a UCC-1 financing statement to be executed by the depositor identifying the trustee as the secured party and identifying all contracts as collateral. Unless otherwise specified in the related prospectus supplement, the contracts will not be stamped or otherwise marked to reflect their assignment from the depositor to the trust fund. Therefore, if a subsequent purchaser were able to take physical possession of the contracts without notice of an assignment, the interest of the certificate holders in the contracts could be defeated. See "Legal Aspects of Mortgage Loans."

The trustee, or the custodian, will review and hold the documents in trust for the benefit of the securityholders. Unless otherwise provided in the related prospectus supplement, if any document is found to be defective in any material respect, the mortgage loan seller must cure the defect within 60 days, or within another period specified in the related prospectus supplement, the mortgage loan seller, not later than 90 days or within another period specified in the related prospectus supplement, after the trustee's discovery of the defect. If the defect is not cured, the mortgage loan seller will repurchase the related contract or any property acquired in respect of the contract from the trustee at a price equal to the remaining unpaid principal balance of the contract, or, in the case of a repossessed manufactured home, the unpaid principal balance of the contract immediately prior to the repossession, or, in the case of a series as to which an election has been made to treat the related trust fund as a REMIC, at such price or another price as may be set forth in the related prospectus supplement, in each case together with accrued but unpaid interest to the first day of the month following repurchase at the related annual percentage rate, plus any unreimbursed advances with respect to the contract.



**Certified Forensic Loan Auditors**

Unless otherwise specified in the related prospectus supplement, the repurchase obligation will constitute the sole remedy available to the securityholders or the trustee for a material defect in a contract document.

Unless otherwise specified in the related prospectus supplement, each mortgage loan seller of contracts will have represented, among other things, that

- immediately prior to the transfer and assignment of the contracts, the mortgage loan seller had good title to, and was the sole owner of each contract and there had been no other sale or assignment of the relevant contract,

- as of the date of transfer, the contracts are subject to no offsets, defenses or counterclaims,
- each contract at the time it was made complied in all material respects with applicable state and federal laws, including usury, equal credit opportunity and disclosure laws,
- as of the date of transfer, each contract is a valid first lien on the related manufactured home and the manufactured home is free of material damage and is in good repair,
- as of the date of transfer, no contract is more than 30 days delinquent in payment and there are no delinquent tax or assessment liens against the related manufactured home and
- with respect to each contract, the manufactured home securing the contract is covered by a standard hazard insurance policy in the amount required in the agreement and that all premiums now due on insurance have been paid in full.

All of the representations and warranties of an mortgage loan seller in respect of a contract will have been made as of the date on which the mortgage loan seller sold the contract to the depositor or its affiliate; the date the representations and warranties were made may be a date prior to the date of initial issuance of the related series of notes or certificates, as applicable. A substantial period of time may have elapsed between the date as of which the representations and warranties were made and the date of initial issuance of the related series of notes or certificates, as applicable. Since the representations and warranties referred to in the preceding paragraph are the only representations and warranties that will be made by a mortgage loan seller, the mortgage loan seller's repurchase obligation described below will not arise if, during the period commencing on the date of sale of a contract by the mortgage loan seller to the depositor or its affiliate, the relevant event occurs that would have given rise to the obligation had the event occurred prior to sale of the affected contract. Nothing, however, has come to the depositor's attention that would cause it to believe that the representations and warranties referred to in the preceding paragraph will not be accurate and complete in all material respects in respect of contracts as of the date of initial issuance of the related series of notes or certificates, as applicable.

If a mortgage loan seller cannot cure a breach of any representation or warranty made by it in respect of a contract that materially and adversely affects the interest of the securityholders in the contract within 90 days, or another period specified in the related prospectus supplement, after notice from the master servicer, the mortgage loan seller will be obligated to repurchase the contract at a price equal to, unless otherwise specified in the related prospectus supplement, the principal balance of the contract as of the date of the repurchase or, in the case of a series as to which an election has been made to treat the related trust fund as a REMIC, at that price or such other price as may be set forth in the related prospectus supplement, in each case together with accrued and unpaid interest to the first day of the month following repurchase at the related annual percentage rate, plus the amount of any unreimbursed advances in respect of the contract. The master servicer will be required under the applicable agreement to enforce this obligation for the benefit of the trustee and the securityholders, following the practices it would employ in its good faith business judgment were it the owner of the contract. Except as otherwise set forth in the related prospectus supplement, this repurchase obligation will constitute the sole remedy available to securityholders or the trustee for a breach of representation by an mortgage loan seller.

Neither the depositor nor the master servicer will be obligated to purchase a contract if an mortgage loan seller defaults on its obligation to do so, and no assurance can be given that sellers will carry out their respective repurchase obligations with respect to contracts.

*Assignment of Agency Securities*

The depositor will cause the agency securities to be registered in the name of the trustee or its nominee, and the trustee concurrently will execute, countersign and deliver the securities. Each agency security will be identified in a schedule appearing as an exhibit to the related agreement, which will specify as to each agency security the original principal amount and outstanding principal balance as of the cut-off date, the annual pass-through rate, if any, and the maturity date.

*Assignment of Private Mortgage-Backed Securities*



Certified Forensic Loan Auditors

The depositor will cause private mortgage-backed securities to be registered in the name of the trustee. The trustee or custodian will have possession of any certificated private mortgage-backed securities. Unless otherwise specified in the related prospectus supplement, the trustee will not be in possession of or be assignee of record of any underlying assets for a private mortgage-backed security. See "The Trust Funds—Private Mortgage-Backed Securities." Each private mortgage-backed security will be identified in a schedule appearing as an exhibit to the related agreement which will specify the original principal amount, outstanding principal balance as of the cut-off date, annual pass-through rate or interest rate and maturity date for each private mortgage-backed security conveyed to the trustee.

## Anti-Deficiency Legislation and Other Limitations on Lenders

Several states have imposed statutory prohibitions that limit the remedies of a beneficiary under a deed of trust or a mortgagee under a mortgage. In several states, statutes limit the right of the beneficiary or mortgagee to obtain a deficiency judgment against the borrower following foreclosure or sale under a deed of trust. A deficiency judgment is a personal judgment against the former borrower equal in most cases to the difference between the net amount realized upon the public sale of the real property and the amount due to the lender. Other statutes require the beneficiary or mortgagee to exhaust the security afforded under a deed of trust or mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the borrower. Finally, other statutory provisions limit any deficiency judgment against the former borrower following a judicial sale to the excess of the outstanding debt over the fair market value of the property at the time of the public sale. The purpose of these statutes is generally to prevent a beneficiary or a mortgagee from obtaining a large deficiency judgment against the former borrower as a result of low or no bids at the judicial sale.

In addition to laws limiting or prohibiting deficiency judgments, numerous other statutory provisions, including the federal bankruptcy laws and state laws affording relief to debtors, may interfere with or affect the ability of the secured mortgage lender to realize upon collateral or enforce a deficiency judgment. For example, with respect to federal bankruptcy law, the filing of a petition acts as a stay against the enforcement of remedies of collection of a debt. Moreover, a court with federal bankruptcy jurisdiction may permit a debtor through his or her Chapter 13 rehabilitative plan to cure a monetary default with respect to a mortgage loan on a debtor's residence by paying arrearages within a reasonable time period and reinstating the original mortgage loan payment schedule even though the lender accelerated the mortgage loan and final judgment of foreclosure had been entered in state court, provided no sale of the property had yet occurred, prior to the filing of the debtor's Chapter 13 petition. Several courts with federal bankruptcy jurisdiction have approved plans, based on the particular facts of the reorganization case, that effected the curing of a mortgage loan default by paying arrearages over a number of years.

Courts with federal bankruptcy jurisdiction have also indicated that the terms of a mortgage loan secured by property of the debtor may be modified if the borrower has filed a petition under Chapter 13. These courts have suggested that the modifications, contained in the debtor's rehabilitative payment plan, may include reducing the amount of each monthly payment, changing the rate of interest, altering the repayment schedule and reducing the lender's security interest to the value of the residence, thus leaving the lender a general unsecured creditor for the difference between the value of the residence and the outstanding balance of the loan. Federal bankruptcy law and limited case law indicate that the foregoing modifications could not be applied to the terms of a loan secured by property that is the principal residence of the debtor, or other real property purchased by the mortgagor within one year prior to commencement of the mortgagor's bankruptcy. In all cases, the secured creditor is entitled to the value of its security plus post-petition interest, attorneys' fees and costs to the extent the value of the security exceeds the debt.

The Bankruptcy Reform Act of 1994 established the National Bankruptcy Review Commission for purposes of analyzing the nation's bankruptcy laws and making recommendations to Congress for legislative changes to the bankruptcy laws. A similar commission was involved in developing the Bankruptcy Code. The NBRC delivered its report to Congress, the President of the United States and the Chief Justice of the Supreme Court on October 20, 1997. Among other topics, high leverage loans were addressed in the NBRC's report. Despite several ambiguities, the NBRC's report appears to recommend that Congress amend Bankruptcy Code section 1322(b)(2) by treating a claim secured only by a junior security interest in a debtor's principal residence as protected only to the extent that the claim was secured when the security interest was made if the value of the property securing the junior security interest is less than that amount. However, the express language of the report implies that a claim secured only by a junior security interest in a debtor's principal residence may not be modified to reduce the claim below the appraised value of the property at the time the security interest was made. A strong dissent by some members of the NBRC recommends that the protections of Bankruptcy Code section 1322(b)(2) be extended to creditors principally secured by the debtor's principal

Page | 26



**Certified Forensic Loan Auditors**

residence. Section 1322(b)(2), which was not amended in connection with the 2005 amendments to the Bankruptcy Code, permit a Chapter 13 debtor to modify the rights of holding secured claims other than claims secured only by a security interest in real property that is the debtor's principal residence. Additionally, the NBRC's report recommends that a creditor's secured claim in real property should be determined by the property's fair market value, less hypothetical costs of sale. The standard advocated by this recommendation would not apply to mortgages on the primary residence of a Chapter 11 or 13 debtor who retains the residence if the mortgages are protected from modification such as those senior mortgages not subject to modification under Bankruptcy Code Sections 1322(b)(2) and 1123(b)(5). The final NBRC report may ultimately lead to substantive changes to the existing Bankruptcy Code, such as reducing outstanding loan balances to the appraised value of a debtor's principal residence at the time the security interest in the property was taken, which could affect the mortgage loans included in a trust fund and the enforcement of rights therein. However, no such changes were made in the 2005 amendments to the Bankruptcy Code.

Several tax liens arising under the Code may provide priority over the lien of a mortgage or deed of trust. In addition, substantive requirements are imposed upon mortgage lenders in connection with the origination and the servicing of single family mortgage loans by numerous federal and state consumer protection laws. These laws include the Federal Truth-in-Lending Act, Regulation Z, Real Estate Settlement Procedures Act, Regulation X, Equal Credit Opportunity Act, Regulation B, Fair Credit Billing Act, Fair Housing Act, Fair Credit Reporting Act and related statutes. These federal laws impose specific statutory liabilities upon lenders who originate mortgage loans and who fail to comply with the provisions of the law. This liability may affect assignees of the mortgage loans. In particular, the originators' failure to comply with requirements of the Federal Truth-in-Lending Act, as implemented by Regulation Z, could subject both originators and assignees of the obligations to monetary penalties and could result in obligors' rescinding loans against either originators or assignees.

In addition, some of the mortgage loans may be subject to special rules, disclosure requirements and other provisions that were added to the federal Truth-in-Lending Act by the Homeownership Act, if such mortgage loans are not loans made to finance the purchase of the mortgaged property and have mortgage rates or origination costs in excess of certain prescribed levels. Such mortgage loans, the "High Cost Loans". The Homeownership Act requires certain additional disclosures, specifies the timing of those disclosures and limits or prohibits inclusion of certain provisions in mortgages subject to the Homeownership Act. Purchasers or assignees of any High Cost Loan, including the trust, could be liable under federal law for all claims and subject to all defenses that the borrower could assert against the originator of the High Cost Loan, under the federal Truth-in-Lending Act or any other law, unless the purchaser or assignee did not know and could not with reasonable diligence have determined that the loan was subject to the provisions of the Homeownership Act. Remedies available to the borrower include monetary penalties, as well as rescission rights if appropriate disclosures were not given as required or if the particular mortgage includes provisions prohibited by the law. The maximum damages that may be recovered under these provisions from an assignee, including the trust, is the remaining amount of indebtedness plus the total amount paid by the borrower in connection with the mortgage loan

## ARTICLE II
### CONVEYANCE OF MORTGAGE LOANS;
### ORIGINAL ISSUANCE OF CERTIFICATES

**SECTION 2.01** Conveyance of Mortgage Loans.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement (except Section 18 thereof), and all other assets included or to be included in REMIC I-A and REMIC II. Such assignment includes all interest and principal received by the Depositor or the Master Servicer on or with respect to the Mortgage Loans (other than payments of principal and interest due on such Mortgage Loans on or before the Cut-off Date or any applicable additional interest accruing during the fixed-rate period on any Relationship ARM with respect to which the applicable relationship discount has been reduced or eliminated). The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement, and the Trustee, on behalf of the Certificateholders, acknowledges receipt of the same.



Certified Forensic Loan Auditors

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Trustee or a Custodian on its behalf, the following documents or instruments (a *"Mortgage File"*) with respect to (I) each Mortgage Loan so transferred and assigned (other than a Mortgage Loan that is a Cooperative Loan):

(i)     The Mortgage Note, endorsed by manual or facsimile signature without recourse by the Originator or an Affiliate of the Originator in blank or to the Trustee showing a complete chain of endorsements from the named payee to the Trustee or from the named payee to the Affiliate of the Originator and from such Affiliate to the Trustee;

(ii)     The original recorded Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording thereon or a copy of the Mortgage certified by the public recording office in those jurisdictions where the public recording office retains the original;

(iii)     Unless the Mortgage Loan is registered on the MERS® System, an assignment to the Trustee in recordable form of the Mortgage which may be included, where permitted by local law, in a blanket assignment or assignments of the Mortgage to the Trustee, including any intervening assignments and showing a complete chain of title from the original mortgagee named under the Mortgage to the Person assigning the Mortgage Loan to the Trustee (or to MERS, noting the presence of the MIN, if the Mortgage Loan is registered on the MERS® System);

(iv)     Any original assumption, modification, buydown or conversion-to- fixed-interest-rate agreement applicable to the Mortgage Loan;

(v)     With respect to any Mortgage Loan listed on the Mortgage Loan Schedule as subject to a Primary Mortgage Insurance Policy, the original Primary Mortgage Insurance Policy or certificate or a copy thereof;

(vi)     The original or a copy of the title insurance policy (which may be a certificate or a short form policy relating to a master policy of title insurance) pertaining to the Mortgaged Property, or in the event such original title policy is unavailable, a copy of the preliminary title report and the lender's recording instructions, with the original to be delivered within 180 days of the Closing Date or an attorney's opinion of title in jurisdictions where such is the customary evidence of title; and

and (II) with respect to each Mortgage Loan that is a Cooperative Loan so transferred and assigned:

(vii)     The Mortgage Note, endorsed by manual or facsimile signature without recourse by the Originator or an Affiliate of the Originator in blank or to the Trustee showing a complete chain of endorsements and assignments from the named payee to the Trustee or from the named payee to the Affiliate of the Originator and from such Affiliate to the Trustee;

(viii)     The original executed proprietary lease or occupancy agreement and all assignments thereof showing a complete chain of assignment from the named secured party to the Trustee;

(ix)     The original stocks, shares, membership certificate or other contractual agreement evidencing ownership and the original stock power executed in blank;

(x)     The original executed recognition agreement and any executed assignments of recognition agreement showing a complete chain of assignment from the named secured party to the Trustee;

(xi)     The original executed security agreement or similar document and all assignments thereof showing a complete chain of assignment from the named secured party to the Trustee;

(xii)     Except for Mortgage Loans (x) secured by Mortgaged Properties in the State of New Jersey or (y) originated prior to October 1988 and secured by Mortgaged Properties in the State of New York, the executed UCC-1 financing statement with evidence of recording thereon and executed original UCC-3 financing statements or other appropriate UCC financing statements required by state law, evidencing a complete and unbroken chain from the mortgagee to the Trustee with evidence of recording thereon (or in a form suitable for recordation); and

(xiii)     Any original assumption, modification or buydown agreement applicable to the Mortgage Loan.

In instances where an original recorded Mortgage cannot be delivered by the Depositor to the Trustee (or a Custodian on behalf of the Trustee) prior to or concurrently with the execution and delivery of this Agreement, due to a delay in connection with the recording of such Mortgage, the Depositor may, (a) in lieu of delivering such original recorded Mortgage referred to in clause (ii) above, deliver to the Trustee (or a Custodian on behalf of the Trustee) a copy thereof, provided that the Depositor certifies that the original Mortgage has been delivered to a title insurance company for recordation after receipt of its policy of title insurance or binder therefor (which may be a certificate relating to a master policy of title insurance), and (b) in lieu of delivering the completed assignment in recordable form



Certified Forensic Loan Auditors

referred to in clause (iii) above to the Trustee (or a Custodian on behalf of the Trustee), deliver such assignment to the Trustee (or a Custodian on behalf of the Trustee) completed except for recording information. In all such instances, the Depositor will deliver the original recorded Mortgage and completed assignment (if applicable) to the Trustee (or a Custodian on behalf of the Trustee) promptly upon receipt of such Mortgage. In instances where an original recorded Mortgage has been lost or misplaced, the Depositor or the related title insurance company may deliver, in lieu of such Mortgage, a copy of such Mortgage bearing recordation information and certified as true and correct by the office in which recordation thereof was made. In instances where the original or a copy of the title insurance policy referred to in clause (vi) above (which may be a certificate relating to a master policy of title insurance) pertaining to the Mortgaged Property relating to a Mortgage Loan cannot be delivered by the Depositor to the Trustee (or a Custodian on behalf of the Trustee) prior to or concurrently with the execution and delivery of this Agreement because such policy is not yet available, the Depositor may, in lieu of delivering the original or a copy of such title insurance referred to in clause (vi) above, deliver to the Trustee (or a Custodian on behalf of the Trustee) a binder with respect to such policy (which may be a certificate relating to a master policy of title insurance) and deliver the original or a copy of such policy (which may be a certificate relating to a master policy of title insurance) to the Trustee (or a Custodian on behalf of the Trustee) within 180 days of the Closing Date, in instances where an original assumption, modification, buydown or conversion-to-fixed-interest-rate agreement cannot be delivered by the Depositor to the Trustee (or a Custodian on behalf of the Trustee) prior to or concurrently with the execution and delivery of this Agreement, the Depositor may, in lieu of delivering the original of such agreement referred to in clause (iv) above, deliver a certified copy thereof.

To the extent not already recorded, except with respect to any Mortgage Loan for which MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record, the Master Servicer, at the expense of the Seller shall promptly (and in no event later than five Business Days following the later of the Closing Date and the date of receipt by the Master Servicer of the recording information for a Mortgage) submit or cause to be submitted for recording, at no expense to any Trust REMIC, in the appropriate public office for real property records, each Assignment delivered to it pursuant to (iii) above. In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Master Servicer, at the expense of the Seller, shall promptly prepare or cause to be prepared a substitute Assignment or cure or cause to be cured such defect, as the case may be, and thereafter cause each such Assignment to be duly recorded. Notwithstanding the foregoing, but without limiting the requirement that such Assignments be in recordable form, neither the Master Servicer nor the Trustee shall be required to submit or cause to be submitted for recording any Assignment delivered to it or a Custodian pursuant to (iii) above if such recordation shall not, as of the Closing Date, be required by the Rating Agencies, as a condition to their assignment on the Closing Date of their initial ratings to the Certificates, as evidenced by the delivery by the Rating Agencies of their ratings letters on the Closing Date; provided, however, notwithstanding the foregoing, the Master Servicer shall submit each Assignment for recording, at no expense to the Trust Fund or the Master Servicer, upon the earliest to occur of: (A) reasonable direction by Holders of Certificates entitled to at least 25% of the Voting Rights, (B) the occurrence of a Master Servicer Event of Termination, (C) the occurrence of a bankruptcy, insolvency or foreclosure relating to the Seller, (D) the occurrence of a servicing transfer as described in Section 7.02 of this Agreement and (E) with respect to any one Assignment the occurrence of a foreclosure relating to the Mortgagor under the related Mortgage. Notwithstanding the foregoing, if the Seller fails to pay the cost of recording the Assignments, such expense will be paid by the Master Servicer and the Master Servicer shall be reimbursed for such expenses by the Trust as set forth herein.

In connection with the assignment of any Mortgage Loan registered on the MERS System, the Depositor further agrees that it will cause, within 30 Business Days after the Closing Date, the MERS System to indicate that such Mortgage Loans have been assigned by the Depositor to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field *"Pool Field"* which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Depositor further agrees that it will not, and will not permit the Master Servicer to, and the Master Servicer agrees that it will not and will not permit a Sub-Servicer to, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

In connection with its servicing of Cooperative Loans and as required by law, the Master Servicer will use its best efforts to file timely continuation statements with regard to each financing statement and assignment relating to Cooperative Loans as to which the related Cooperative Unit is located outside of the State of New York.



**Certified Forensic Loan Auditors**

With respect to a maximum of approximately 5.00% of the Original Mortgage Loans, by outstanding principal balance of the Original Mortgage Loans as of the Cut-off Date, if any original Mortgage Note referred to in (i) above cannot be located, the obligations of the Depositor to deliver such documents shall be deemed to be satisfied upon delivery to the Trustee (or a Custodian on behalf of the Trustee) of a photocopy of such Mortgage Note, if available, with a lost note affidavit. If any of the original Mortgage Notes for which a lost note affidavit was delivered to the Trustee (or a Custodian on behalf of the Trustee) is subsequently located, such original Mortgage Note shall be delivered to the Trustee (or a Custodian on behalf of the Trustee) within three Business Days.

The Depositor shall deliver or cause to be delivered to the Trustee (or a Custodian on behalf of the Trustee) promptly upon receipt thereof any other original documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan.

All original documents relating to the Mortgage Loans that are not delivered to the Trustee (or a Custodian on behalf of the Trustee) are and shall be held by or on behalf of the Seller, the Depositor or the Master Servicer, as the case may be, in trust for the benefit of the Trustee on behalf of the Certificateholders. In the event that any such original document is required pursuant to the terms of this Section to be a part of a Mortgage File, such document shall be delivered promptly to the Trustee (or a Custodian on behalf of the Trustee). Any such original document delivered to or held by the Depositor that is not required pursuant to the terms of this Section to be a part of a Mortgage File, shall be delivered promptly to the Master Servicer.

Wherever it is provided in this Section 2.01 that any document, evidence or information relating to a Mortgage Loan be delivered or supplied to the Trustee, the Depositor shall do so by delivery thereof to the Trustee or Custodian on behalf of the Trustee.

It is agreed and understood by the parties hereto that it is not intended that any Mortgage Loan to be included in the Trust Fund be (i) a *"High-Cost Home Loan"* as defined in the New Jersey Home Ownership Act effective November 27, 2003, (ii) a *"High-Cost Home Loan"* as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, (iii) a *"High-Cost Home Mortgage Loan"* as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 or (iv) a *"High Cost Home Loan"* as defined in the Indiana Home Loan Practices Act effective January 1, 2005. It is agreed and understood by the parties hereto that it is not intended that any Mortgage Loan to be included in the Trust Fund not comply in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable predatory and abusive lending laws.

http://www.secinfo.com/dqTm6.u27x.c.htm

**Consumer Protection Laws with Respect to Contracts**

Numerous federal and state consumer protection laws impose substantial requirements upon creditors involved in consumer finance. These laws include the Federal Truth-in-Lending Act, Regulation Z, the Equal Credit Opportunity Act, Regulation B, the Fair Credit Reporting Act, the Real Estate Settlement Procedures Act, Regulation X, the Fair Housing Act and related statutes. These laws can impose specific statutory liabilities upon creditors who fail to comply with their provisions. This liability may affect an assignee's ability to enforce a contract. In particular, the originators' failure to comply with requirements of the Federal Truth-in-Lending Act, as implemented by Regulation Z, could subject both originators and assignees of the obligations to monetary penalties and could result in obligors' rescinding the contracts against either the originators or assignees. Further, if the manufactured housing contracts are deemed High Cost Loans within the meaning of the Homeownership Act, they would be subject to the same provisions of the Homeownership Act as mortgage loans as described in "—Anti-Deficiency Legislation and Other Limitations on Lenders" above.

Courts have imposed general equitable principles upon repossession and litigation involving deficiency balances. These equitable principles are generally designed to relieve a consumer from the legal consequences of a default.



**Certified Forensic Loan Auditors**

In several cases, consumers have asserted that the remedies provided to secured parties under the UCC and related laws violate the due process protections provided under the 14th Amendment to the Constitution of the United States. For the most part, courts have upheld the notice provisions of the UCC and related laws as reasonable or have found that the repossession and resale by the creditor does not involve sufficient state action to afford constitutional protection to consumers.

The so-called Holder-in-Due-Course Rule of the Federal Trade Commission has the effect of subjecting a seller, and related creditors and their assignees, in a consumer credit transaction and any assignee of the creditor to all claims and defenses which the debtor in the transaction could assert against the seller of the goods. Liability under the FTC Rule is limited to the amounts paid by a debtor on the contract, and the holder of the contract may also be unable to collect amounts still due thereunder.



**Certified Forensic Loan Auditors**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
Form 8-K
CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): July 27, 2007

CITIGROUP MORTGAGE LOAN TRUST INC.
(as depositor under the Pooling and Servicing Agreement,
dated as of July 1, 2007, providing for the issuance of
Citigroup Mortgage Loan Trust Inc., Series 2007-AR8

Mortgage Pass-Through Certificates)
Citigroup Mortgage Loan Trust 2007-AR8
(as issuing entity)

Citigroup Mortgage Loan Trust Inc.
(as registrant)

Citigroup Global Markets Realty Corp.
(as sponsor)

| Delaware | 333-138237-20 | 01-0791848 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

390 Greenwich Street
New York, New York

10013
(Zip Code)

(Address of Principal Executive Offices)

Registrant's telephone number, including area code: (212) 816-6000

http://www.secinfo.com/dqTm6.u27x.htm

Page | 32



Certified Forensic Loan Auditors

# MOODY'S
## alacra

Search for More Reports
Advanced Search

my purchases ☑ my cart my account help login

Home ■ Credit Research ■ Moody's Global Credit Research

# MOODY'S
## INVESTORS SERVICE

**Citigroup Mortgage Loan Trust 2007-AR8**
10320 word report published May 03, 2012
Price $550.00

more from Moody's Global Credit
Research

  ♀ -1

ADD to CART

**Price: $550.00**
$ £ €

| Report Overview | Search Inside | About Moody's Global Credit Research |

Global Credit Research Performance Report 3 MAY 2012 Performance Report: Citigroup Mortgage Loan Trust
2007-AR8 Citigroup Mortgage Loan Trust 2007-AR8 Download Performance Report in .csv format Moody's Deal
Number: 820435056 Citigroup...

**Report Type:** Performance Report
**Issuer:** Citigroup Mortgage Loan Trust 2007-AR8
**Free Sample:** Click Here to Download
**Format:** HTML

Free Sample

❓ Questions about
"this research"?

✉ Send page to a friend

## Also from Moody's Global Credit Research

Moody's takes action on $6.2 billion of Jumbo RMBS issued by Citicorp Mortgage Trust from 2005 to 2008 - Rating
Action $150.00
Global Credit Research Rating Action 19 MAY 2010 Rating Action: Citicorp Mortgage Securities Trust, Series 2008-
2 Moody's takes action on $6.2 billion of Jumbo RMBS issued by Citicorp Mortgage Trust from 2005 to 2008 New
York, May...

**More Credit Research**

Search all our Credit
Research from one place.

Certified Forensic Loan Auditors

# MOODY'S
## INVESTORS SERVICE

**Rating Action: Moody's rates Citigroup Mortgage Loan Trust 2007-AR8 Prime Mortgage Deal**

Global Credit Research - 15 Aug 2007

**Approximately $832 Million of Mortgage-Backed Securities rated**

New York, August 15, 2007 -- Moody's Investors Service has assigned a Aaa rating to the senior certificates issued by Citigroup Mortgage Loan Trust 2007-AR8, and a Aa1 rating to various super-senior support certificates. The trust issued two separate sets of certificates, the Group 1 Certificates and the Group 2 Certificates, each backed by a distinct and separate pool of residential mortgage loans.

The Group 1 certificates are backed by Collateral Pool 1, a pool of adjustable-rate, prime residential mortgage loans originated by Countrywide Home Loans, Inc. GreenPoint Mortgage Funding, Inc. and Wells Fargo Bank, N.A. The Group 2 certificates are backed by Collateral Pool 2, a pool of adjustable-rate, prime residential mortgage loans originated by Wells Fargo Bank, N.A. The ratings on each set of certificates are based primarily on the credit quality of the loans backing these certificates and on the protection against credit losses provided by loss subordination. Moody's expects cumulative losses on the loan pool backing the Group 1 Certificates to range from 0.55% to 0.65%, and the cumulative losses on the loan pool backing the Group 2 Certificates to range from 0.45% to 0.55%.

Wells Fargo Bank, N.A. Countrywide Home Loans Servicing LP, and GreenPoint Mortgage Funding, Inc., will service the residential mortgage loans. CitiMortgage, Inc. will act as master servicer. Moody's has assigned Countrywide and Wells Fargo as top servicer quality rating of SQ1 as a servicer of prime mortgage loans. Moody's has assigned CitiMortgage its servicer quality rating of SQ2 as a master servicer.

THE COMPLETE RATING ACTIONS ARE AS FOLLOWS

Citigroup Mortgage Loan Trust 2007-AR8

Mortgage Pass-Through Certificates, Series 2007-AR8

Cl. 1-A1A, Assigned Aaa

Cl. 1-A1B, Assigned Aa1

Cl. 1-A2A, Assigned Aaa

Cl. 1-A2B, Assigned Aa1

Cl. 1-A3A, Assigned Aaa

Cl. 1-A3B, Assigned Aa1

Cl. 1-3D, Assigned Aaa

Cl. 1-R, Assigned Aaa

Cl. 2-A1A, Assigned Aaa

Cl. 2-A1B, Assigned Aa1

Cl. 2-R, Assigned Aaa

Additional research is available on http://www.moodys.com.

New York
David Teicher



Certified Forensic Loan Auditors

## THE CORRECT PROCESS OF SECURITIZATION



**PARTY A**
**ORIGINATOR/LENDER**

WELLS FARGO HOME
MORTGAGE

**PARTY B**
**SPONSOR/SELLER**

**Citigroup Global
Markets Realty**

**TRUE SALE**
1) LEGAL OPINIONS
2) ASSET PURCHASE / SALE
   AGREEMENTS
3) DELIVERY &
   ACCEPTANCE RECEIPTS
4) COMPENSATION /
   MONEY
5) CAPACITY OF PARTIES
   TO BUY AND SELL

**PARTY C**
**DEPOSITOR**

**Citigroup Mortgage
Loan Trust Inc.**

**PARTY D**
**ISSUING ENTITY**

**Citigroup Mortgage Loan
Trust 2007-AR8**

## HOW LENDERS "SIDE-STEPPED" THE PROCESS



**PARTY A**
**LENDER**

. WELLS FARGO HOME
MORTGAGE

**PARTY B**
**SPONSOR/SELLER**

**Citigroup Global
Markets Realty**

**TRUE SALE**
1) LEGAL OPINIONS
2) ASSET PURCHASE / SALE
   AGREEMENTS
3) DELIVERY &
   ACCEPTANCE RECEIPTS
4) COMPENSATION / MONEY
5) CAPACITY OF PARTIES
   TO BUY AND SELL

**PARTY C**
**DEPOSITOR**

**Citigroup Mortgage
Loan Trust Inc.**

**PARTY D**
**ISSUING ENTITY**

**Citigroup Mortgage Loan
Trust 2007-AR8**



Certified Forensic Loan Auditors

# SECTION 3: FORECLOSURE

### Chain of Mortgage and Chain of Note
### Recorded Events on the Loan Including Foreclosure Issues and Securitization

| Recorded Chain of MORTGAGE Possession | | Chain of Note Possession | |
|---|---|---|---|
| Date | Original MORTGAGE | SIGNED BY DATE | Notes comments |
| April 8, 2005 Not recorded. securitized | LOAN Margareta Collin Laon #0052521093 Wells fargo home mortgage (no beneficiary, nominee or assignee) Exhibit 1 | ORIGINAL LOAN DATE April 8, 2005 | Well fargo home Mortgage Lender Principal Amount: $875,000.00 MIN- none LOAN # 0052521093 |
| April 8, 2005 RECORDED WITHOUT NOTE 15PGS Instrument # 05 0912015 | Deed of Trust FIDELITY NATIONAL TITLE INSURANCE CO. 17911 VON KARMAN #200 IRVINE CA 92614 Exhibit 2 | | NO BENEFICIARY, NOMINEE, ASSIGNEE NO UCC FILINGS ACCORDING TO THE POOLING AND SERVICING AGREEMENTS |
| JAN 09,2012 Instrument # 2012-0035109 Official Records, LOS ANGELES County California | Notice of Default Certified and requested by First American title ins. Co. For $82,813.24 As of 01/09/2012 *Exhibit 3* | FIRST AMERICAN TRUSTEE SOLUTIONS, LLC 6 Campus circle, 2nd fl Westlake TX. 76262 JOE BUENO NO TITLE Notice of default declaration signed by QUANLETICIA ANDERSON VP OF LOAN | April 8, 2005 Fidelity national is actual trustee First American had no standing to issue notice of default. Fidelity national was still the trustee. (erroneously recording contraband documents at the county recorder) |
| RECORDED JAN. 25, 20012 Instrument #20120132849 Official Records, LOS ANGELES County California | CORPORATE ASSIGNMENT OF DEED OF TRUST (from wells fargo bank n.a., to US bank n.a. as trustee for citigroup mortgage loan trust inc) For $975,000.00(loan was for $875,000.00) | NO PROPER ASSIGNMENT OR RECORDINGS SIGNED BY CARLA NAUGHTON VP OF LOAN DOCUMENTATION | Wells fargo assigned trust deed to trustee of pool not beneficiary/holder in due course but trustee NO UCC FILINGS ACCORDING TO THE POOLING AND SERVICING AGREEMENTS |



**Certified Forensic Loan Auditors**

| | | | |
|---|---|---|---|
| 02/24/2012 Instrument # 20120296071 RECORDED Official Records, LOS ANGELES_ County California | SUBSTITUTION OF TRUSTEE REMOVING FIDELITY NATIONAL TITLE INS. CO. AND SUBS FOR FIRST AMERICAN TITLE INS. CO. 02/08/2012 Exhibit 5 | SIGNED BY WELLS FARGO NA SERVICER NOT BENEFICIARY OF OWNER OF MORE THAN 51% OF POOL PAMELA E. WILLIAMSON ALSO VP OF LOAN DOCUMENTATION Exhbit 5 pg 3 | NOTARIZATION DECLARED ILLEGIBLE by same notary that did the substitution BY including a FORM UNDER 27361.7 CODE WICH SPECIFIES THAT A LEGIBLE COPY TO BE ATTACHED(which was not) AND PROVIDES FOR NOTARY ID NUMBER for NOTARIES COMMISSIONED AFTER 01/01/1992 (no # provided) signed by LAURA HERAS/ a DPS AGENT? (recording illegible/contraband documents) |
| 04/11/2012 Instrument #20120539581 Recorded in official records of Los angeles county California | Notice of trustee sale Recorded by First American Title insurance company. The alleged trustee not properly appointed Exhibit 6 | | Trustee not substituted correctly according to California civil procedure |
| Since April 8, 2005 | 1. No proper assignments or recordings . 2. Deed of trust separated from note. 3. No fall guy(mers) to avoid certain tax liabilities should transfers or assignments of note take place 4. No ucc filings according to pooling and servicing agreements 5. Corporate assignment to trustee of pool not depositor. signed by possible robo signer | 6. NOD sent by wrong trustee Signed by possible robo signer 7. Substitution signed out of turn. By possible robo signer. Without proper notarization 8. Notice of trustee sale invalid void(dealings not in good faith) | |



**Certified Forensic Loan Auditors**

| $875,000.00 | X | 0(or)00000still | =0 |
|---|---|---|---|

# REPORT SUMMARY

**MORTGAGE:**

- On <u>April 8, 2005</u> , Margareta Collin, executed (1)a promissory note and (2) a security interest in the form of a MORTGAGE(dead pledge) in the amount of $<u>875,000.00</u>
- The Deed of Trust document was filed as document number <u>050912015</u> in the Official Records of <u>LOS ANGELES</u> County, CA.
- The *original BROKER pretender lender of the promissory note is WELLS FARGO HOME MORTGAGE.*
- *Note was cashed and deposited without recourse*
- *Note was separated from Deed of Trust.*
- *Note was securitized insured and sold into a stocktrade certificate (personal property)*
- *There still stands the question whether any money was ever lent for damages to be claimed, or whether the money (funds) was created by signature of the note and wired from the treasury. (see national bank act."Banks cannot loan money")*

**Securitization (no note exist): Citigroup Mortgage Loan Trust 2007-AR8**

- ➢ The certificate was sold, transferred, assigned and securitized into **Citigroup Mortgage Loan Trust 2007-AR8**
- ➢ Cut off date of July 1, 2007
- ➢ Closing date of July 31, 2007
- ➢ Loan was originated in August 8, 2005. Why is the pool from 2007
- ➢ No proper assignments recordation alonge or ucc filings
- ➢ No clear chain of title

# Notice of Default and Election to Sell Under MORTGAGE:

Notice of Default; Certified and requested by First American Title ins. Co. For $82,813.24 As of 01/09/2012. JAN 09,2012, Instrument # 2012-0035109, Official Records of LOS ANGELES County California

Notice of default declaration signed by QUANLETICIA ANDERSON , third Vice President OF LOAN DOCUMENTATION .( not of wells fargo or citigroup.)

According to the Deed of Trust signed April 8, 2005 appointed and assigned only Fidelity national is actual trustee.



Certified Forensic Loan Auditors

First American had no standing to issue notice of default. In January 9, 2012. The substitution was not recorded until February 24, 2012. Fidelity national was still the trustee. (erroneously recording contraband documents at the county recorder)

## Assignment of MORTGAGE: N/A NONE ON RECORD AT COUNTY RECORDER

- An Assignment of MORTGAGE was filed as document number _____ in the Official Records, _____ County, CA on _____. This document purports to be executed by MERS.

## Substitution of Trustee: RECORDED AT COUNTY RECORDER

- On 02/24/2012, a Substitution of Trustee was filed as document number  20120296071  in the Recorder's Office, Los Angeles County, CA.   This document  properly identifies the trustee as FIDELITY NATIONAL TITLE INSURANCE CO. AS THE APPOINTED TRUSTEE TO BE SUBSTITUTED BY FIRST AMERICAN TITLE INSURANCE COMPANY.
- FIRST AMERICAN TITLE INSURANCE CO. FILED A NOTICE OF DEFAULT ON JANUARY 9, 2012.

## Notice of Trustee's Sale: RECORDED AT COUNTY RECORDER

- On APRIL 13, 2012, a Notice of Trustee's Sale was filed as document number 20120539581, in the Official Records, OF Los Angeles County, CA.



Certified Forensic Loan Auditors

# LAWS AND INFORMATION ABOUT SECURITIZATION SECTION

**Hawkins, Case No. BK-S-07-13593-LBR (Bankr.Nev. 3/31/2009) (Bankr.Nev., 2009)** – "A "beneficiary" is defined as "one designated to benefit from an appointment, disposition, or assignment . . . or to receive something as a result of a legal arrangement or instrument." BLACK'S LAW DICTIONARY 165 (8th ed. 2004). But it is obvious from the MERS' "Terms and Conditions" that MERS is not a beneficiary as it has no rights whatsoever to any payments, to any servicing rights, or to any of the properties secured by the loans. To reverse an old adage, if it doesn't walk like a duck, talks like a duck, and quacks like a duck, then it's not a duck."

**Saxon vs Hillery, Dec 2008, Contra Costa County Superior Court**, an action by Saxon to foreclose on a property by lawsuit was dismissed due to lack of legal standing. This was because the Note and the Deed of Trust were "owned" by separate entities. The Court ruled that when the Note and Deed of Trust were separated, the enforceability of the Note was negated until rejoined.

WELLS FARGO HOME MORTGAGE was a "correspondent lender" that originated mortgage loan which in turn, was sold and transferred into a "federally-approved securitization" trust named **Citigroup Mortgage Loan Trust 2007-AR8**. It becomes readily clear that the Note and Deed have taken two distinctly different paths.

The written agreement that created the **Citigroup Mortgage Loan Trust 2007-AR8** is a "Pooling and Servicing Agreement" (PSA), and is a matter of public record, available on the website of the Securities Exchange Commission. The Trust is also described in a "Prospectus Supplement," which is available on the SEC website as well. The Trust by its terms set a "CLOSING DATE" of JULY 31, 2007. Based on the documents received, it appears as though the promissory note in this case did not become trust property in compliance with the requirement set forth in the PSA. The Trust agreement is filed under oath with the Securities and Exchange Commission. The acquisition of the assets of the subject Trust and the PSA are governed under New York State trust law.

*In view of the foregoing, all Assignments of Deed of Trust executed after 90 Days after the Trust's Closing Date would be a void act for the reason that it violated the express terms of the Trust instrument.*

The loan was originally ALLEGED TO BE made BY WELLS FARGO HOME MORTGAGE and was sold and transferred to **Citigroup Mortgage Loan Trust 2007-AR8**. There is no PROPERLY record of Assignments to either the Sponsor or Depositor as required by the Pooling and Servicing Agreement.

In *Carpenter v. Longan* 16 Wall. 271,83 U.S. 271, 274, 21 L.Ed. 313 (1872), *the U.S. Supreme Court stated "The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."*



**Certified Forensic Loan Auditors**

An obligation can exist with or without security. With no security, the obligation is unsecured but still valid. A security interest, however, cannot exist without an underlying existing obligation. It is impossible to define security apart from its relationship to the promise or obligation it secures. The obligation and the security are commonly drafted as separate documents – typically a promissory note and a deed of trust. If the creditor transfers the note but not the deed of trust, the transferee receives a secured note; the security follows the note, legally if not physically. If the transferee is given the deed of trust without the note accompanying it, the transferee has no meaningful rights except the possibility of legal action to compel the transferor to transfer the note as well, if such was the agreement. (Kelley v. Upshaw 91952) 39 C.2d 179, 246 P.2d 23; Polhemus v. Trainer (1866) 30C 685)

"Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000)

By statute, assignment of the mortgage carries with it the assignment of the debt. . . Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. *The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose,* unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. *The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust.*"



**Certified Forensic Loan Auditors**

# Notification of Assignment, Sale or Transfer of Mortgage Loan

## Section 131(g) of the Truth in Lending Act (15 USC § 1641)(TILA)

This section was amended on May 19, 2009, to include a new provision requiring the assignee of a mortgage loan to notify a consumer borrower that the loan has been transferred. Section 131(g) requires the new owner or assignee of a mortgage loan must notify the borrower in writing within 30 days after the mortgage loan is sold of otherwise transferred. This notification must include the following:

- 1. The assignee's identity, address and phone number;

- 2. The date of transfer;

- 3. Contact information for an agent or party having authority to act on behalf of the assignee;

- 4. The location or the place where transfer of ownership of the debt is recorded; and,

- 5. Any other relevant information regarding the assignee.

An Assignee that violates this notice requirement is subject to civil penalties under Section 130(a) of TILA. Further, effective July 31, 2009, the maximum penalty increased from $2000.00 to $4000.00 that an individual consumer may recover for each TILA violation in connection with a closed-end loan secured by real property or a dwelling increased. Additionally, TILA's Section 108 provides that "a violation of any requirement imposed under TILA shall be deemed a violation of a requirement imposed under [the FTC's Act]," regardless of whether a person committing a violation otherwise comes under the FTC's jurisdiction. For willful or knowing violations, a person may be fined up to $5,000 and/or imprisoned for up to one year, in accordance with Section 112 of TILA.

## NO CLEAR CHAIN OF TITLE

There appears to be at least two (2) assignments missing within the chain of title. The borrower may want to explore the option of pursuing WELLS FARGO HOME MORTGAGE or their successors for monetary damages for the lack of these assignments pursuant to violations of the TILA and FTC Acts.



Certified Forensic Loan Auditors

## CONCLUDING REMARKS

Consumer Protection Laws. The so-called *"Holder-in-Due Course"* rule of the FTC is intended to defeat the ability of the transferor of a consumer credit contract who is the seller of goods which gave rise to the transaction, and particular, related lenders and assignees, to transfer that contract free of notice of claims by the contract debtor. The effect of this rule is to subject the assignee of a contract of this type to all claims and defenses that the debtor under the contract could assert against the seller of goods. Liability under this rule is limited to amounts paid under a contract; however, the obligor also may be able to assert the rule to set off remaining amounts due as a defense against a claim brought by the Trustee against that obligor. Numerous other federal and state consumer protection laws impose requirements applicable to the origination and lending pursuant to the contracts, including the Truth in Lending Act, the Federal Trade Commission Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act and the Uniform Consumer Credit Code. In the case of some of these laws, the failure to comply with their provisions may affect the enforceability of the related contract.

The assent of each party must be freely given; a contract entered into as a result of the exercise of duress or undue influence by the other party, or procured by the fraud of one of the parties, lacks the essential element of real assent and may be avoided by the injured party. Wall v. Bureau of Lathing and Plastering (1960, Fla App D3) 117 So 2d 767

1.  Without a meeting of the minds of the parties on an essential element, there can be no enforceable contract. Hettenbaugh v. Keyes-Ozon-Fincher Ins., Inc. (1962, Fla App D3) 147 So 2d 328; Goff v. Indian Lake Estates, Inc. (1965, Fla App D2) 178 So 2d 910.

2.  "unconscionability is not merely a defensive doctrine but rather it goes to the predicate of whether a contract was initially formed in the first place." *California Grocers Ass'n, Inc. v. Bank of America,* 22 Cal.App.4th 205, 217 1994):

3.  *Blake v. Ecker,* 93 Cal.App.4th 728, 742 (2001) (the substantive element of unconscionability "traditionally involves contract terms that are so one-sided as to 'shock the conscience' *or that impose harsh or oppressive terms.*") (emphasis added) (citing *Armendariz,* 24 Cal.4th at 114).

4.  "if a contract is one of adhesion, it is procedurally unconscionable." *Circuit City v. Adams,* 279 F.3d 889, 893 (9th Cir.), *cert. denied,* 122 S. Ct. 2329 (2002)...

5   "a contract is procedurally unconscionable if it is "a contract of adhesion: a standard-form contract, drafted by the party with superior bargaining power, which relegates to the other party the option of either adhering to its terms without modification or rejecting the contract entirely."; *Flores v. Transamerica HomeFirst, Inc.,* 93 Cal.App.4th 846, 853 (2001) (same); *Mercuro v. Superior Court,* 96 Cal.App.4th 167, 174 (2002), *rev. denied.*



**Certified Forensic Loan Auditors**

Prepared
by

*Fabain N. Rojas*
Certified Auditor

Founder of
H.E.L.M. INC...
Humanitarian Equality Liberation Movement
Not for profit...

HELM_INC@YAHOO.COM
213-273-4165

DISCLAIMER

THIS REPORT IS BASED ON DOCUMENTATION AND INFORMATION PROVIDED BY BARROWWER, COUNCIL AND, PUBLIC RECORD, NOT TO BE CONCIDERED AS LEGAL ADVICE, DOES NOT IMPLY ANY RESULT, GUARANTEE OR OUTCOME, TO ANY PARTY INVOLVED.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Manuel Real and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

## CV12- 5858 R (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

Unless otherwise ordered, the United States District Judge assigned to this case will hear and determine all discovery related motions.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Margareta Collin
2350 Vista Ridge lane
Signal Hill, CA 90755

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Margareta Collin pro se | CASE NUMBER |
|---|---|
| PLAINTIFF(S) v. | CV12 05858 R (Ex) |
| First American trustee Servicing Solutions LLC, Wells Fargo Bank, N.A. Us Bank National Association, as trustee for CMLTI and Does 1-10 DEFENDANT(S). | SUMMONS |

TO:  DEFENDANT(S):

    A lawsuit has been filed against you.

    Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Margareta Collin_____, whose address is _2350 Vista Ridge ln, Signal Hill, Ca 90755_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ____7/6/12_____        By_____
                                        Deputy Clerk

                                        (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                         SUMMONS

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Margareta Collin | FIRST AMERICAN TRUSTEE SERVICING SOLUTIONS LLC, ET AL WELLS FARGO BANK, NA., ET AL, US BANK NATIONAL ASSOCIATION, SERVICING AS TRUSTEE FOR CMLTI 2007-AR8 |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Margareta Collin<br>2350 Vista Ridge ln Signal Hill, Ca 90755<br>310-951-5923 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No   ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
"Violation of the Fair Credit Reporting Act and the Debt Collection Practices Act".

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☑ 440 Other Civil Rights | | |
| | ☐ 290 All Other Real Property | | ☐ 465 Other Immigration Actions | | |

## CV12 05858

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)
☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): *Margarita Wells*  Date  7-6-12

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |